UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
                              Plaintiff                    12-CV-2220 (TPG)(FM)

                  - against -

McLaughlin Stern LLP and                    AFFIDAVIT OF JAMES COURI
Jon Paul Robbins Esq.,                         WITH EXHIBITS
                              Defendants.



STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

James Couri (Couri) being duly sworn deposes and says:

**INTRODUCTION**

1. I am the natural father of Plaintiff, Lydia Alexandra Couri (Alex), and I am fully and

personally familiar with all of the facts stated herein. I have read the Complaint and I am also

familiar with it and the exhibits to it. In 2008 I left New York for California in order to

commence treatment for cancer and other medical disorders. Please see Exhibits A and B hereto,

true and correct copies of an Affidavit and Affirmation signed by Dr Thomas Reynolds, my

primary care doctor, outlining my medical conditions. My condition precludes me from travel.

2. The facts stated herein are true and correct to the best of my present knowledge, information

and belief, and are based upon my best recollection of events that occurred over a period of more

than thirty years.  I am not a lawyer.

3. Although I am not a Party herein, my name, alleged activities, supposed wrongdoings and

alleged events have been set forth in the Complaint supposedly about me that mandate my

coming forward and advising the Court of the fraud, lies and deception being perpetrated before

it. I append as Exhibits C and D, some biographical information about me as published by Linkedin and an acclaimed and active Website that I was a founder of in early 2009, resigning in Dec. 2009, which was shortly after I was told on Oct 13, 2009 that time I had about 12 months to live due to spreading of Stage 4 Cancer.

4. The Complaint in this Case weaves a web of interactions allegedly involving me, defendants and others that are outright fabrications, made up and without basis in fact or law. The Parties, each for their own agendas, have steadfastly refused to Depose me to elicit the facts as I know them, but rather attempt to misuse my name and concoct events to shore up the respective positions of all Parties. In a nutshell, I am being used as a scapegoat and patsy while the Court is being defrauded by clever legerdemain. I have repeatedly offered myself for Deposition in California to all Parties, but my overtures have fallen on deaf ears.

5. I have submitted two Affidavits in this case dated 12-22-12 and 2-21-13. I fully reaffirm the contents of both of them and to the exhibits to them as being true and accurate. I append these Affidavits hereto as Exhibits E and F, with exhibits to them.

6. I am 74 years old. I am suffering from numerous medical disorders, including but not limited to cancer, heart disease, gastrointestinal disorders, and severed nerve and muscular disorders. I respectfully refer the Court to the Affidavit and Affirmation of Dr Thomas Reynolds, Exhibits A and B hereto. I am unable to travel as a result of my condition.

7. Accordingly, the Parties' Attorneys here, in particular Max Folkenflik Esq., have the "perfect storm" to use and misuse the Court, attack an infirmed "non-party"(me), throw me under the bus with wild and groundless claims and allegations, grounded mostly on guesswork, supposed reasonable inference, and fabricated events. The seeming hope of Max Folkenflik it seems is to

(2)

fool the Court and to extort and blackmail defendants and me. In a nutshell, the Complaint, in as much as the pleading refers to me in various fabricated events and bogus interactions, is devoid of facts and relies on the fertile mind and fantasies of Mr. Folkenflik Esq. who refuses to rectify his lies. What Mr. Folkenflik has done is plead the Case with "fairy-tales" rather than the facts and the truth.

8. I sincerely apologize to the Court for necessity of this Affidavit, but since neither Folkenflik or Attorney Kohel have chosen to Depose me, and many relevant facts and details are being suppressed while falsehoods are being permitted to blossom, I must try and put before the Court facts as I know, lived and recall them, which have significant impact on this Case and claims. It is absurd that in the 21st Century, Lawyers can perpetuate a Case in the Federal Courts implementing outright lies, cheating, fraud and perjury. Particularly in the Southern District of New York. Candidly the brazen and dastardly acts of Mr. Folkenflik are despicable.

9. As the Court may recall, I was on the phone at a Hearing on August 16, 2012, Ordered by Your Honor. I listened attentively at the temerity of Mr. Folkenflik when he addressed the Court. Brazen Max Folkenflik stood before this Court and concocted a series of fantasy events that never happened, lied to the Court as to my activities with Alex and lied as to communications with Robbins, making me a patsy and a scapegoat implementing lies and deception and frauds on the Court. In fact the very funds placed in the "1989 Trust" came from me. Also, evidence in this Court proves that during the relevant periods I paid and caused to be paid about $1 million to and for Alex. Folkenflik is sadly a disreputable lawyer, a liar and is engaging in fraud on the Court. At the same time Folkenflik is, by his brazen acts of cheating, wrecking my family and my daughter's health and reputation. Sad as it is, this is nothing new for Mr. Folkenflik as his MO reveals that this is his pattern of litigating. Litigation by "shake-downs, name calling and

(3)

harassment." See: Trigano v Bain, USDC Mass, '99-CV-12535.

10. Accordingly, I want to try and "set the Record straight" in this Affidavit. Again, I am willing to be deposed at any time in California, an offer made and rejected up to now.

## BACKGROUND

11. Alex was born Nov. 20, 1978. Her natural mother, Carla, suffered from the Disease of "alcoholism." For the record, Carla has been "substance free" for many years and is now a Substance Abuse Counselor. She is presently qualified to evaluate Alex's addictions. I append here a true and accurate copy of Carla Nations Affidavit dated May 14, 2012 as Exhibit I hereto, outlining Carla's first-hand knowledge and experiences with her daughter Alex.

12. From Alex's birth, she was catered to by me, household help, and lived in an elitist environment in a 8 room co-operative apartment on 80th Street and Madison Avenue. Alex and I enjoyed a close love and personal relationship up to November of 2011, (when Folkenflik and his California-partner-lawyer David R Fisher directed Alex not to speak to me, my wife Marlene or to Carla). Carla's illness was difficult for both Alex and me. In 1981, through an "Intervention" with Dr John Trane, I was successful in entering Carla into Smithers Institute in NYC for drug abuse rehabilitation. Carla was in treatment at Smithers for about 60 days. For a while she was on her way to "recovery" and tried to function as Alex's mother. All the while I was providing for all of Alex and my family's every need to the best of my abilities. Alex was attending the finest private schools, camps, country clubs, etc. I made substantial monetary gifts to and for Alex as well, (see: Exhibit F, hereto Aff of James Couri)

13. After numerous relapses and disappearances by Carla, in 1985 I retained the law firm of

(4)

Nitkin Alkaly, Handler and Robbins, the predecessor firm to what now is McLaughlin Stern LLP (MS). My purpose was to obtain sole and separate custody of Alex in order to secure her future and safety.

14. My Case for Custody of Alex was assigned to Judge Sandra Miller, in the Unified Court System in White Plains NY. Judge Miller is now is a sitting Justice in the Appellate Division Third Department in Brooklyn NY.

15. After extensive litigating and lengthy, Court Ordered psychiatric, psychological evaluations, interviews and Reports, Background Reports, Testimony from others as to my character etc., and after Alex advised the Court that she chose to live with me; the Court awarded me "Sole and Separate Custody of Alex". This was in addition to all doctors/ psychiatrists, etc., recommendation of me and assessments by the professionals of my dedication as a highly intelligent and motivated father and Carla ultimately consenting to the Custody Award in my favor, signed by Judge Miller in mid 1986. It is important to note that my Mother (who passed away in 1991) also affirmed to the Court my qualifications as a competent, dedicated father. This is contrary to the Folkenflik misuse of my Mother's name in this Case.

16. I took this Custody responsibility very seriously. I dedicated my time to care for Alex, attend all School functions as her "mother" and as her "father" even attending "school-mothers days". I also retained competent household help to aid in my care of Alex. Her mother Carla (although having visitation rights) disappeared and remained so for approximately 7 years.

17. During the late 1960's my Father and I, with my money, created a duty-free business, International Duty Free Ltd.; which later became Duty Free International (DFI). My brother John was broke and needed a job. My dad had experienced some financial reversals and I was aiding

(5)

him in supporting his home and lifestyle. John was previously expelled from Brunswick Prep School, in Greenwich CT for cheating, lying and "breaking and entering" at the School. I financed DFI, secured other investors and became involved in its growth. Thereafter, I went on to other ventures, leaving my DFI Shares in the care of my Dad, whom I loved and trusted.

18. My father became ill with brain cancer and passed away in October 1978, before Alex was born. Before Dad died, my brother John and his wife (behind my back) looted my DFI shares being held by my Dad. John, although given ample opportunity, refused to reverse his conversion of my DFI Shares. Although I was always a sucker for family, I finally decided to pursue my brother's theft of my DFI shares in Court.

19. In or about 1988, after marrying my present wife Marlene, I retained McLaughlin Stern LLP (MS) to file legal action for the recovery of my money. I at that time I chose to assign my claims against John to Alex, which had a value of well over $15Million, based on DFI's records.

20. The litigation was very distasteful to me and USDJ Charles L. Brieant (SDNY) encouraged a resolution. The Case was settled for a pittance of $175,000.00 payable by $87,500.00 down and the balance 12 months later, to be paid in the newly created Lydia Alexandra Couri 1989 Trust (LACT). Jon Paul Robbins Esq., (Robbins) who represented me in the Case against my brother John, was asked by USMJ Tyler to become the LACT Trustee. Robbins agreed and accepted the appointment.

21. The Folkenflik Complaint before this Court miscasts this Trust as "a family inheritance". Such characterization is a outright lie. The 1989 Lydia Alexandra Couri Trust was funded with money that was mine and looted from me by my brother John and his wife. My litigation resulted in the initial funding for the LACT.

(6)

22. Although Trustee Robbins is a lawyer, he admitted to me from the outset that he has no experience in investments and that he was planning to seek the guidance of others and of me. Since LACT began with $87,500.00 and Alex was a minor with a Trust with about a 30 year life, I gave the matter significant thought since I wanted the best for Alex. That was why I assigned the money to her in the first place.

23. Soon thereafter I urged Robbins, orally and in writing to buy for the LACT, $87,500.00 in Microsoft (MSFT) common stock and hold it; and keep the other $87,500,00 in Money Market bearing then about 7% . It was my view, having years of experience being involved in the Markets, that MSFT was the best possible investment. Robbins refused to entertain any stock purchases, although Alex should, as a minor been invested in solid growth companies, which MSFT was the best of the best at that time and possibly even now. I append as Exhibit G a true and correct copy of a Memo I sent in or about early 1990 to Robbins suggesting the LACT investing in Microsoft. I recently found a copy of this hand written "memo" and turned it over to Robbins.

24. It seems that my advice to Robbins was correct, as $87,500.00 invested in MSFT in 1989 today would be worth over $4,700,000.00.

25. During these periods of time I was doing well financially and health-wise, but by about 1990 I began to suffer from medical disorders that became worse, including macular degeneration, eye disease, esophageal-dysplasia, and intestinal disorders. Also during this period, I had substantial receivables due to me and due to Companies that I controlled. I was beginning to experience a "cash-crunch".

(7)

26. I became alarmed at that time that I may not be able to finance, on a current basis, Alex's School, camps and related expenses, because I was unable to timely collect significant portions of receivables due to me and my Companies. Notwithstanding, I always made sure that the obligations incurred for Alex and her benefit were considered first before anything else.

27. I reluctantly approached Robbins in an attempt to see if I could secure a loan from the LACT to ensure all of the Alex School and related bills would be paid without interruptions. I was sick and felt awful seeking Robbins' help. I also offered to go to the Court by Motion and ask Judge Charles Brieant for his direction.

28. At no time did I or Robbins or anyone else enter into any understanding or "quid-pro-quo" as to fees or otherwise, to loot, rob or dismember the LACT that I funded in the first place. Folkenflik's allegations are despicable, a fraud on the Court, factually ridiculous, and without basis in fact.

29. On the other hand it was my view then (and now) that Robbins should have gone to the Court and, along with me, obtained permission/guidance to make advances from the LACT for the purposes I intended and obtain a Method to do so, if at all. Robbins advised me that he had discretion and did not need to seek any Court permission to issue the advances I was seeking.

30. I at all times accepted the Robbins-LACT advances on the grounds that I would reimburse directly or indirectly all moneys advanced. My Affidavit before the Court dated Feb 21, 2013 reveals the about $1million I paid to and for Alex's maintenance, schools, camps, lifestyle and travel expenses, etc., from 1990 to 2011. Again, as to these matters, the Complaint is replete with fraud, trickery, fantasy and deception concocted by Mr. Folkenflik.

(8)

31. I love my daughter Alex dearly. I never went to "Father School". I have done all within my power to provide for Alex as best as I could. Now with a heavy heart I am now confronted with this nightmare, as sadly Alex has really no idea the damage she has done and continues to do to herself and her family and to others. Max Folkenflik is a cheat, a liar and a disreputable charlatan.

32. At no time did I conspire with Robbins, MS, or CPA Robert Modansky, to loot the LACT or to cause CPA Modansky to create a phony-false Evaluation of the worth of Couri Acquisition Corp, an Entity I was involved. The fact is CPA Modansky was retained by me for my wife Marlene to prepare such Evaluation in anticipation for Marlene to submit it to the Internal Revenue Service and to NY State Department of Tax and Finance, as part of a Tax mandate for a Gift Marlene was making to her own Trust, having nothing to do with Alex. Marlene paid CPA Modansky for his Evaluation and paid a significant Gift Tax. Moreover, as far as I know, Robbins never met Modansky at all.

33. Folkenflik again simply makes up a convenient story as part of this fraud on the Court. It is my opinion that Folkenflik is devoid of ethics or human integrity. Interestingly, I offered Mr. Folkenflik the opportunity to assume, for pursuit for my daughter Alex, significant claims I have against a doctor pursuant to an Agreement (Case 113512-2008 NY Supreme Court). I am plaintiff and the claim is for over $20 million with all defenses waved by this disgraced doctor. Folkenflik curiously refused. Candidly, there is something rotten ongoing here. Why would a Lawyer, Folkenflik, pursue "bogus claims" with a phony-perjured sloppy Complaint, and yet refuse to assume a valid and open case for his client, Alex, with a defendant-doctor who confessed to the moneys due, and who has been proved to be a liar and a predator doctor fired from 4 major NY Hospitals. I gave Max and Alex a gift of this case (113512-08, NY Supreme

(9)

Ct). I believe Mr. Folkenflik's agenda here is jaundiced and alarming. My daughter is being used as a patsy because she is ill and unsophisticated. A perfect target for the likes of sociopath Folkenflik.

## FACTS

34. No LACT moneys were used for any purpose other than for Alex's benefit. No "back-room" deals were made by me to rob my own money that I turned over to fund the LACT.

35. That said, as I sit here today writing this Affidavit, Alex is without the money placed into the LACT in 1989 and 1990 through my efforts and expense. As Alex's Father and the creator of this Trust, I am coming to grips with whether and to what extent Robbins is culpable for his acts or failure to act as Trustee. So here are the facts as I see and assess them. As Alex's Father and as the creator of the LACT and as a involved (but not sued) principal who "lived this saga", I am prepared to be Deposed about anything contained herein:

   a) FACT:  LACT was funded with Settlement of Claims against John Couri that in 1988 I gave to Alex----"James Couri as Custodian for Lydia Alexandra Couri".

   b) FACT: The Case against John was settled for $175,000.00, a pittance of what John owed me, but the entire matter was so distasteful, I agreed to a meager settlement against my best interest.

   c) FACT: Robbins became Trustee to LACT, but admitted his lack of investment knowledge or abilities.

   d) FACT: Robbins refused to invest any portion of the LACT in common stocks, in particular MSFT at my insistence. If he followed my guidance to put $87,500.00 into MSFT in 1989-1990 today its worth would be over $4,700,000.00.

   e) FACT: Should Robbins have sought guidance from the Court regarding any withdrawals from the LACT that I was seeking?  In my view the answer is YES, and I offered to Move the Court myself. Robbins declined stating same was unnecessary.

   f) FACT: did Robbins make any clandestine arrangements with me regarding his conduct as Trustee or otherwise? The answer is unequivocally NO.

g) FACT: Was Robbins stupid, lazy, lax, and incompetent and negligent in his role as Trustee for LACT from 1989? The answer is YES, but he was not a thief, and no Trust money was stolen.

h) FACT: Would I have abandoned Alex or my Family if Robbins did not make advances from the LACT to me and for the needs of Alex? The answer is absolutely NO.

i) FACT: Would I have done anything "reckless" if Robbins or the Court rejected my requests? Again, certainly NO.

j) FACT: If the Court declined my getting advances from the LACT, or if Robbins refused to make any cash advances, I would have proceeded to make every effort to pledge my receivables as collateral for loans to secure cash in order to pay my bills for Alex and my Family. Folkenflik's bogus claim of clandestine dealings is outrageous and a pure fabrication. The fact is all of these receivables were ultimately collected by my efforts.

k) FACT: Robbins relies on letters and memos as a basis for his acts. Such is no solace for Alex who is left with zero from this LACT. In my view, Robbins encouraged these letters knowing in his heart, he was in deep water and yet for unknown reasons, unwilling to simply go to the Court, rather than running around soliciting letters to paper his file. Robbins was an incompetent Trustee and owes something to Alex. Candidly he should be a man and step to the plate, because he had no ability to assess any qualified investments and "blew-it".

## SUMMARY

36. I respectfully apologize to the Court for the necessity for this Affidavit, but I am a central figure in this Case, and I am not a Party. My only child is the Plaintiff, I am ill, I cannot travel; I reside in California. The Court is being conned and fooled. Max Folkenflik Esq. has woven a web of lies, deceit, fantasy and fraud, by using me and my family to further his schemes, using an unsophisticated ill person, my daughter Alex, as if a "donkey with a carrot". The Complaint, as pled, has no basis in fact or law. Alex admits in her Deposition that the allegations are as a result of the "research of her lawyer Folkenflik" and she has no personal knowledge of the claims in the Complaint. The Complaint woefully fails to reveal the facts. It is a scam using me and Robbins as convenient "carnival-ducks".

37. I am not a lawyer. I am a father and what is going on here is sickening. I want the best for Alex, my daughter; but not at the expense of the Truth. Mr. Folkenflik has used this MO of

(11)

"guesswork and inferences". He has been excoriated by many Courts for his similar antics. His theory is to harass, name call, attack and bully his adversaries into submission so that they pay his blackmail in order to get rid of "Mad Max". (See: Trigano v Bain, USDC, Mass, 99 CV-12535.)

38. If Folkenflik's Complaint is to be believed, one has to believe that I was stealing money from myself. Now we can also all believe in the good fairy, and look under our pillow tonight for our gift.

39. For whatever it is worth, having lived this matter and interacted with all Parties, it is my view that Robbins was not qualified to be the Trustee to the LACT . Robbins has no knowledge as to investments in anything. He was lazy and remiss, and since he was not paid, he refused to seek the Court's approvals and failed to do anything other than disburse the Trust moneys. Robbins also failed to properly secure the advances he made, (regardless of what else I did financially for Alex). In fact if he had purchased $87,500.00 of MSFT stock for cash, he could have, if given Court approval, pledged MSFT for a loan and I could have paid the loan off redeeming the MSFT Shares. Then the LACT would have retained this significant asset. In my view Robbins was negligent and failed to make any qualified investments for the LACT and for Alex's benefit. In fact, he made no investments at all. Robbins was negligent and failed woefully as Trustee with sloppy and incompetent conduct leaving Alex with a goose egg.

40. On the other hand Robbins is not a thief. He is a family man and a lawyer. Contrary to Folkenflik's claims, Robbins is not my friend, nor is he my co-conspirator. Robbins and his firm MS, are simply lawyers that I called upon, from time to time, to represent me and various of my Companies. In fact since I began my business activities in or about 1957 I retained and used

(12)

different Law Offices both in NYC and in California, from time to time, some much more actively than Robbins and MS. Robbins and his law office were insignificant to me and I made no deal with them for special treatment. If anything, my involvements with Robbins were more bother than they were worth for both him and for me; and surely not lucrative. On that basis alone Max Folkenflik's Complaint is ridiculous. Here is a partial list of Law Offices I used from about 1957 to now: Parker Dureyer; Saxe, Bacon & Boland; Roy M Cohen; Howard Krantz; Bandler & Kass; Pryor Cashman; Neil Comer; Edward Bennet Williams; Williams & Connoly; Shea Gould; Vincent Malone; Boboroff, Olonoff & Scharf; McLaughlin Stern; Baker Mckenzie; Marc Stuart Goldberg; Skaden-Arps; Bruce Cutler; Ronald L Kuby; Michel Smith; Gerald Mondora; Kuby & Perez; Alan Grant; Henry Krinsky; Rover Law Firm; Hyman Bravin; and others.

41. Max Folkenflik regretfully is, yet again, using the Courts as his personal fiefdom. His unscrupulous conduct is just like the card-sharks that play " 3-card montie" and lure in the suckers on Broadway in the 1950's. Sadly, the temerity of Max Folkenflik Esq. has caused severe injury to my family, our home and life, and in fact to Alex herself. By Max's manipulation of a gullible and unsophisticated young woman (Alex) he is depriving her of needed medical care and her family's love. Max has no conscience. I am making this presentation to the Court, not for myself, but for my daughter Alex; as I know the true facts; and I do not need the crutch of hearsay and inference.

WHEREFORE: Lydia Alexandra Couri has been disenfranchised out of her Trust moneys, not because of theft or dishonest acts; but because of Robbins' incompetence, ineptness, laxity, and laziness. Robbins admitted his lack of investment knowledge or abilities. Trust money was turned over to me without the Court's approval and without the Trustee Robbins securing

(13)

proper Agreements and protections for the LACT, and the funds under Robbins aegis. Robbins was grossly remiss in not making proper, or at all, investments for the LACT for Alex's benefit (ie: MSFT). To be sure, Robbins is responsible to Alex for his ineptness, incompetence and negligence. Sadly, Robbins was a "candlestick maker trying to make shoes". This is why I have taken the position that I owe money to Alex along with money I owe Marlene, who also advanced money for Alex's schools, and other expenses. Attached here as Exhibit H is a true and accurate copy of my Affidavit, "Sworn-to" by me on Feb. 15, 2010 and consented to at that time by Alex and my wife Marlene, outlining my position as to funds I am obligated for to my daughter and wife. The Affidavit was made about 16 weeks after I was told that I had 9 to 12 months to live due to the recurrance of deadly Stage 4 Melanoma Cancer. Thank God that at UCLA Medical Center in California I was blessed to partake in a test drug program in April 2010; which by Oct. 2010 caused the Cancer to be in "remission". I am now involved in constant tests and scans monitoring my condition. I blame myself for allowing the forgoing to happen, resulting in significant loss to Alex; and the horror of this situation for Alex, me, Marlene, Carla and Mr. Robbins.

James Couri
78365 Highway 111, suite 322
La Quinta, CA 92253
Tel: 760-346-2808

Sworn to before me this ___6th___ day
of May_____2013

_____
Notary Public

NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016

To: The Court
    Cozen O'Connor Esq.s
    Max Folkenfik Esq.
    Paul Robbins Esq.
    Lydia A. Couri
    Fisher & Wolfe LLP

(14)

UNITED STATES DISTRICT COURT

INDEX 12-CV-2220

Lydia Alexandra Couri,
                     Plaintiff,

                                              AFFIDAVIT OF MAIL

          - against -

McLaughlin Stern LLP and
Jon Paul Robbins Esq.,
                     Defendants.

_____

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

MARLENE COURI being duly sworn deposes and says:  I am not a party to this case.

On MAY $\not{6}$ , 2013, I placed in a Mail Depository controlled by the US Government JAMES

COURI'S AFFIDAVIT & EXHIBITS to:

      (a) USDJ Thomas Griesa - Chambers (via FedEx)
          US Courthouse
          500 Pearl Street
          New York, NY 10007

      (b) USMJ Frank Maas
          US Courthouse
          500 Pearl Street
          New York, NY 10007

      (c) Cozen O'Connor
          Att: M. Kohel Esq.
          45 Broadway
          16th Floor
          New York, NY 10006

      (d)  Max Folkenflik Esq.
          Folkenflik McGerety
          1500 Broadway
          21st Floor
          New York, NY 10036

Sworn to before me this  6th
day of  May 2013.

_____
Notary Public

MARLENE COURI



NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016





## AFFIDAVIT

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE


Dr. Thomas F. Reynolds being duly sworn deposes and says under penalty of perjury:

    1. I am a Diplomate, American Boards of Internal Medicine and Medical Oncology.

    2. I am affiliated with Cedars Sinai Medical Center in Los Angeles, California and Eisenhower Medical Center, in Rancho Mirage, California.

    3. James Couri has been my patient since 2006.

    4. I make this Affidavit after evaluations of Mr. Couri's: medical condition, physical examinations and consultations with Mr. Couri, and my review of Mr. Couri's recent medical, surgical and radiology records from UCLA Medical Center and other medical institutions; particularly, relative to Mr. Couri's Stage IV cancer, cardiac condition; and current gastro intestinal disorders.


### STAGE IV CANCER & IPILIMUMAB TREATMENT PROTOCOL

    5. Mr. Couri was diagnosed with Level V, Stage III Melanoma Cancer in 2006 and confirmed lympovascular invasion. He underwent surgery at that time for the removal of the malignancy and approximately 17 lymph glands, some also with invasion of malignancy.

    6. Thereafter, Mr. Couri has been actively monitored by me and Specialists affiliated with UCLA Medical Center in Los Angeles, CA, and other medical institutions.

    7. On or about October 15, 2009, Mr. Couri was diagnosed with a recurrence of melanoma cancer, Stage IV, in his lung area and elsewhere. Mr. Couri also recently learned of his exposure to asbestos. This is medically significant in view of his fragile immune system, his illness, and ongoing treatments and immuno therapy.

    8. Mr. Couri, in October 2009, underwent two surgeries at UCLA Medical Center. On December 15, 2009 at UCLA, Mr. Couri underwent major thorasic surgery for the attempted removal of the newly detected cancer sites.

    9. Based upon subsequent PET-CT Scans and post-operative and pathology reports, etc., it was confirmed that Mr. Couri's cancer disease had not been fully removed. In fact, the PET/CT Scans of Mar. 21, 2010 and of Feb. 22, 2010 taken at UCLA revealed that the findings were consistent with active and progressive metastatic disease.

10. In 2010 Mr. Couri began undergoing in hospital medical and immuno therapy. In March, 2010, due to the gravity of Mr. Couri's condition, and his unresectable Stage IV cancer, UCLA Specialists proposed to Mr. Couri that he be considered for a 'Compassionate Use Research Program' Melanoma Cancer Protocol-CA 184-045, IPILIMUMAB, sponsored by Bristol-Meyers-Squibb, (BMY). This Investigational Drug Protocol was offered to Mr. Couri, by invitation, because he suffers from cancer that spread throughout his body.

11. In April 2010, Mr. Couri entered into a Consent to participate in this highly significant Protocol at UCLA. This Ipilimumab Protocol began on April 21, 2010 and spans an initial 4 Phases (12 Weeks), which includes frequent 90 minute in-Hospital Infusions of Ipilimumab. Thereafter the Protocol and Infusions continue in consecutive cycles of 12 weeks each, and continues thereafter in the same incremental cycles based upon Mr. Couri's condition and the determinations of the Specialists at UCLA, BMY, my office and others involved in this highly important cancer treatment. During this entire Protocol, Mr. Couri must undergo in-UCLA: Pt/Ct Scans, Vital Sign Management, Blood-Draws and numerous physical examinations by various Specialists at UCLA. If any adverse effects appear, Mr. Couri will be immediately hospitalized at UCLA.

12. This Drug Protocol also comes with very significant side effects and risks of which many can be life threatening. The Ipilimumab Drug was then not yet approved by the United States Food and Drug Administration (FDA). It was approved in February 2011.

13. Mr. Couri is also being prescribed potent medications for pain management. Mr. Couri is accordingly being carefully monitored and supervised daily, both in and out of UCLA Medical Center in Los Angeles California. Mr. Couri's condition is extremely serious and is now further complicated by the recent revelation that he is being evaluated for cardiac and intestinal surgeries.

SEVERE CORONARY ARTERY DISEASE & PENDING OPEN HEART SURGERY

14. Mr. Couri continues to suffer from extensive and progressive coronary artery disease and chronic angina. He has undergone six angioplasty procedures to re-canalize some of his occluded arteries, which included the placement of eight stents implants and two unsuccessful attempts to re-canalize his occluded left anterior descending artery.

15. Mr. Couri is required to take multiple mood altering medications and is currently mandated to undergo testing for his cardiac disease, which is monitored by me, and Specialists at UCLA Medical Center, who are also involved in the Ipulimumab Protocol and the constant and complex care of Mr. Couri.

16. Mr. Couri has recently been diagnosed with a recurrence of persistent and severe congestive heart disease. Accordingly Mr. Couri is now undergoing testing and evaluations for his submitting to cardiac surgery in order to recanalize his totally blocked left descending artery and replacement of any impacted and blocked stents. This circumstance will mandate Mr. Couri to first undergo invasive in hospital Angiograms, and significant other testings before heart surgery, which will be conducted on Mr. Couri at UCLA Medical Center. Due to this chronic

angina, it is difficult for Mr. Couri to walk any significant length without experiencing severe angina, discomfort and pain.


## CHRONIC GASTRO-INTESTINAL DISORDERS AND PENDING SURGERY

17. Additionally, Mr. Couri suffers from persistent bowl, digestive and gastro intestinal disorders and obstructions. He was hospitalized for pancreatitis under my care. This condition is further complicated by the infusions of Ipilimumab and his recent finding that he has been unknowingly exposed to asbestos, bacteria, fungus and mold. In fact Mr. Couri has recently experienced intestinal pain, infections and disorders for which he is being medicated. Mr. Couri has been prescribed intestinal antibiotics and other medications in an attempt to control this condition. He is currently undergoing further exploratory, upper GI and other in hospital intestinal testing as well. Mr Couri was admitted on an emergency basis to the UCLA Hospital on August 19, 2011 due to a severe intestinal pain and obstruction, and is presently being treated for this condition. After consultations with surgeons, Mr. Couri is now being evaluated for intestinal surgery in order to resect and remove these intestinal obstructions and constrictions, etc. This proposed surgery is extremely risky and complex due in part to Mr. Couri's health, age and medical situation.

18. Mr. Couri underwent a transhiatal-esophagectomy for dysplasia in 1994 (removal of his esophagus). Mr. Couri therefore continues to suffer from digestive and gastro-intestinal complications for which he is prescribed numerous medications. As a consequence, Mr. Couri is mandated to undergo periodic endoscopic procedures and biopsies to monitor his esophageal condition for cancer and other complications, some of which have again spawned mandating surgery assessment of Mr. Couri's circumstances.


## ASBESTOS AND MOLD EXPOSURE

19. Mr. Couri's recently reported approximate two-year exposure to friable asbestos and airborne mold has significant consequences and complications to Mr. Couri's health care, particularly in light of his fragile immune system and health issues. Based upon my medical teaching and training as an oncologist and medical doctor, at the very least, Mr. Couri will now be required to undergo more frequent pet/CT, CT scans, x-rays, blood tests, and other tests for many years, in the hope of detecting any physiological changes in his lungs and elsewhere due to his exposure to friable asbestos.

20. Mr. Couri's exposure to mold also has significant consequences to his health care also in light of his fragile immune system. Mr. Couri has recently been diagnosed with Filamentary Keratitis by Dr. Greg Evans. Mr. Couri is relegated to a regime of antibiotic and other eye medications, including Tobramycin/Dexamethasone and Vigamox, to attempt to control this resilient eye infection.

21. Mr. Couri's recent diagnosis of a gastro-intestinal bacterial infection requires treatment with a Metronidazole and Xifaxan regimen. This current infection may have been

exacerbated by exposure to mold, fungus and bacteria. Mr. Couri is currently being tested for a recently discovered urological infection as well.

## SPINAL AND SKELETAL DISORDERS & RECENT HIP REPLACEMENT SURGERY

22. Mr. Couri continues to suffer from chronic and severe back pain, spinal inflammation and degenerative spinal disc and shoulder disease. Mr. Couri undergoes therapy and treatment, along with medical intervention to stabilize the pain Mr. Couri experiences related to these conditions. Mr. Couri has also been diagnosed with ankylosing spondylitis.

23. Mr. Couri underwent major surgery of a full hip replacement on March 11, 2011 at UCLA Medical Center.  He is in physical therapy at Eisenhower Medical Center and at UCLA in California.

## MR. COURI'S INABILITY TO TRAVEL OR ENGAGE IN STRESSFUL ACTIVITIES

24. Accordingly, in view of Mr. Couri's numerous, diverse and serious medical disorders, recent surgery, ongoing in hospital cancer treatments, required scans and other immuno-therapy protocols; as well as current evaluations for impending heart surgery, and intestinal surgery, Mr. Couri is mandated to remain in close proximity to my medical office and to the numerous Specialists at UCLA Medical Center in California involved in his medical care. Accordingly, because of the foregoing outlined treatments, impending surgeries, and the complexity and severity of Mr. Couri's medical conditions, (further complicated by his severe and debilitating heart condition), Mr. Couri is physically and mentally fragile, and cannot travel or resume conventional daily activities of any kind, under any circumstances.

25. Mr. Couri's cancer condition, the recurrence of his persistent angina, and his presently being actively tested and evaluated for additional surgeries which are further complicated by eight stents, and the highly toxic Ipilimumab Cancer Protocol he is involved, Mr. Couri requires in hospital and otherwise constant medical attention and supervision. Therefore, the foregoing circumstances mandates ongoing medical supervision and medical testing that Mr. Couri must partake in. Most significantly, Mr. Couri is not physically able and cannot engage in any stressful activities whatsoever which will be life threatening. Any interruption of Mr. Couri's medical protocols will cause Mr. Couri severe injury. Such interferences would exacerbate his already extremely precarious condition and adversely impact his treatment and care. The current disclosure as to Mr. Couri's deteriorating heart condition, persistent angina and recurrence of gastro-intestinal blockages has caused additional negative ramifications to Mr. Couri's fragile health.

26. Accordingly, Mr. Couri's active cancer and other healthcare and treatments, and impending cardiac and intestinal surgeries, mandate that he cannot travel under any circumstances. Mr. Couri must remain in daily physical contact and in close proximity to his healthcare providers and to UCLA Medical Center, in California where his ongoing treatments and testing has and are being conducted. Furthermore, in light of all of the forgoing, Mr. Couri cannot partake in any form of stressful or adverse activities whatsoever. Such circumstances will confront Mr. Couri to extreme risks to his life. If Mr. Couri is confronted with adverse, hostile

or stress of any kind, same will have grave consequences to him, to his fragile health, and will be life threatening to Mr. Couri.

27. The foregoing is based upon my teaching, training, and experience, and the care of Mr. James Couri.

Thomas F. Reynolds MD FACP

Sworn to before me this 23rd
Day of August 2011.

Notary Public

CECILIA M. DIAZ
Commission # 1884427
Notary Public - California
Riverside County
My Comm. Expires Mar 28, 2014

# B

## AFFIRMATION

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr. Thomas F. Reynolds being duly sworn hereby affirms under penalty of perjury as follows:

1. I am a Diplomate, American Board of Internal Medicine and Medical Oncology.

2. I am affiliated with Cedars-Sinai Medical Center in Los Angeles, California, and Eisenhower Medical Center in Rancho Mirage, California.

3. James Couri has been my patient since about 2006.

4. I make this Affirmation after current and frequent evaluations of Mr. Couri's medical condition and review of his recent Surgical and Medical Records from UCLA Medical Center and other Medical Institutions and consultations and examinations with Mr. Couri.

5. Attached as Exhibit A is my Sworn-to Affidavit concerning Mr. Couri's complex medical issues, dated August 23, 2011. I herewith ratify that the conditions in their entirety as set forth in the Affidavit are a true and correct present evaluation of Mr. Couri's current medical condition and circumstances.

6. In addition, Mr. Couri was operated on at UCLA Medical Center on March 29, 2012 for a serious abdominal infection and disorders.

7. Thereafter, it has been determined that Mr. Couri suffered serious neurological damage and complications and injury to his trapezius and parascapular musculature, etc.

8. This injury has caused Mr. Couri significant and constant difficulty and pain. He is attempting further physical therapy, but his situation is extremely complex with limited hope for recovery from this injury. He is taking various potent medications to alleviate pain related to this condition. He is under my care and the care of other medical specialists for this condition.

9. Accordingly, Mr. Couri is both physically and mentally unable to partake in any stressful, adverse or contested activities whatsoever. Such circumstances would subject Mr. Couri to extreme risks, particularly due to his complex coronary artery disease. If Mr. Couri is confronted with hostile, adverse stress of any kind, such will likely have serious consequences to his fragile health and will be life-threatening to Mr. Couri.

10. The foregoing is based upon my teaching, training and experience and the medical care of James Couri.

Dated: November _____, 2012

AFFIRMED UNDER OATH

Thomas F. Reynolds MD FACP

C



### jim couri
PARTNER AT COURI COMPANIES
New York, New York (Greater New York City Area)    Investment Management

| | |
|---|---|
| Current | **CONSULTANT at BEVERLY HILLS-213 ---SCAMS INC** |
| | **CONSULTANT at SCAMS INC** |
| | **CONSULTANT at STARDUST CREATIVE LLC** |
| | see all |
| Past | PRESIDENT at COURI INTL CORP |
| | A FOUNDER & VICE PRESIDENT at DUTY FREE INTL CORP |
| Education | Columbia University - Columbia Business School |
| | BRUNSWICK PREP SCHOOL |
| Connections | **20 connections** |
| Websites | Company Website |
| | Company Website |
| | Company Website |

### jim couri's Summary

CHARITABLE ENDEAVORS, INVESTMENTS, CONSULTING, VENTURE CAPITAL, PUBLISHING, INTERNET, MEDIA, PHOTOGRAPHY, ART, ANTIQUES, MEMORABILIA, AMERICANA, TOYS, COLLECTABLES,

### jim couri's Experience

**CONSULTANT**
**BEVERLY HILLS-213 ---SCAMS INC**
February 2012 – Present (1 year 4 months)   BEVERLY HILLS CA
HAND DELIVERED MAGAZINE PUBLICATIONS AND INTERNET, SOCIAL ACTIVITIES, ART, SALES & BARGAINS, RESTAURANT REVIEWS, MEDIA AND FILMS--REVIEWS, REPORTS ANALYSIS, ETC.

**CONSULTANT**
**SCAMS INC**
February 2011 – Present (2 years 4 months)   BEVERLY HILLS & LA QUINTA CA, AND COLORADO
INTERNET OPERATIONS, MAGAZINE PUBLICATIONS, SCAMS AND CORRUPTION INVESTIGATIONS, ETC

**CONSULTANT**
**STARDUST CREATIVE LLC**
February 2010 – Present (3 years 4 months)   BEVERLY HILLS CA
INTELLECTUAL PROPERTIES, FILM, PUBLISHING, CREATIVE ENDEAVORS, ETC

**CONSULTANT**
**AMERICANS AGAINST CORRUPTION.COM**
July 2008 – Present (4 years 11 months)   BEVERLY HILLS CA
INTERNET AND MEDIA---A WATCHDOG INVESTIGATING & REPORTING ON CORRUPTION

**PARTNER**
**JC ENTERPRISES COMPANY**
February 1974 – Present (39 years 4 months)   NEW YORK CITY, NY BEVERLY HILLS, CA
MANAGEMENT CONSULTING, INVESTMENTS

**president**
**COURI TRADING COMPANY**
June 1972 – Present (41 years)   BEVERLY HILLS, CA-- NEW YORK,NY
MANAGEMENT CONSULTING, INVESTMENTS, VENTURE CAPITAL, ETC

**PARTNER**
**VERMEER VENTURE COMPANY**
March 1970 – Present (43 years 3 months)   BEVERLY HILLS CA, NEW YORK CITY
INVESTMENTS, CONSULTING

**PARTNER**
**COURI COMPANIES**
June 1967 – Present (46 years)   BEVERLY HILLS CA, NEW YORK, NY, COLORADO
INVESTMENTS, CONSULTANTS, VENTURE CAPITAL, MEDIA

**PARTNER**
**JCC COMPANY**
May 1966 -- Present (47 years 1 month)   BEVERLY HILLS CA, NEW YORK
INVESTMENTS, VENTURE CAPITAL

**PRESIDENT**
**COURI INTL CORP**
January 1962 – August 1976 (14 years 8 months)
FAMILY INVESTMENTS

**A FOUNDER & VICE PRESIDENT**

**DUTY FREE INTL CORP**
April 1962 – May 1974 (12 years 2 months)   NYC & CONN

OWNED & OPERATED DOZENS OF DUTY FREE STORES AT MAJOR AIRPORTS INCLUDING JFK IN NYC; MIAMI; TEXAS; HAITI; AND AT CANADIAN BORDERS--SELLING LIQUOR, TOBACCO, WATCHES, CAMERAS, GIFT ITEMS, ETC.
WAS LISTED ON NYSE---"DFI" UNTIL CONTROL WAS SOLD

## jim couri's Publications

**CONFETTI—A NOVEL**
STARDUST CREATIVE LLC
Authors: jim couri, ERIC HUNT, MARLENE CARROLL COURI--
A NOVEL OF A TALE OF FINANCIAL SEDUCTIONS, HI-JINKS AND BAMBOOZLES--

## jim couri's Languages

- French

## jim couri's Skills & Expertise

| Investments | Management Consulting | Internet | Intellectual Property | Media | Venture Capital | Joint Ventures | Lodging |
| Antiques | Art |

## jim couri's Education

**Columbia University - Columbia Business School**
Business Administration and Management, General
1957 – 1960
*Activities and Societies:* BUSINESS, SCIENCE, HISTORY, ENGLISH LITERATURE, MATHEMATICS, ART

**BRUNSWICK PREP SCHOOL**
HISTORY
1954 – 1957
JIM PREVIOUSLY ATTENDED POLLY PREP SCHOOL IN BROOKLYN NY BEFORE RELOCATING TO GREENWICH CT.---IN 1954
*Activities and Societies:* MATHEMATICS, HISTORY, LITERATURE, SCIENCE, SCHOOL PHOTOGRAPHER

## jim couri's Additional Information

| Websites: | • Company Website |
| | • Company Website |
| | • Company Website |
| Interests: | ART, ANTIQUES, PHOTOGRAPHY, COLLECTABLES, CHARITIES, LITERATURE |
| Groups and Associations: | CASA——COURT APPOINTED SPECIAL ADVOCATES—— |
| Honors and Awards: | SENATE MEDAL OF FREEDOM, CONGRESSIONAL MEDAL OF DISTINCTION, PRESIDENTS BUSINESS COUNCIL, BUSINESSMAN OF YEAR 2003-5, CONGRESSIONAL BUSINESS COUNCIL |

## Contact jim for:

| • career opportunities | • consulting offers |
| • new ventures | • job inquiries |
| • expertise requests | • business deals |
| • reference requests | • getting back in touch |

## View jim couri's full profile to...

- See who you and **jim couri** know in common
- Get introduced to **jim couri**
- Contact **jim couri** directly

  **View Full Profile**

LinkedIn member directory - Browse members by country a b c d e f g h i j k l m n o p q r s t u v w x y z more

LinkedIn Corporation © 2011

5/5/13 3:56 AM

# D

Search Scamraiders      Search

- Sign In



- Home
- My Page
- About Us
- Scamraider News
- Discussion Forum
- Blogs
- Scamraiders YouTube

# About Jim Couri

<u>WHO IS JIM COURI: Why was he involved in this Project? Take a Look</u>
<u>(By the way, Jim is not a lawyer)</u>



**Introduction**

Jim's background and life experiences caused him to decide to perceive and aid in the creation of this unique Website. Jim acted as a consultant to SCAMRAIDERS, working for one dollar a year and resigning in 2009, in order to help victims of all forms of scams, corruption, and fraud, by educating and using his life-training and personal 'messes' to assist our website. His input showed how to, and what to look for, and how to put a stop to abuse, fraud, tampering and cover-ups. Jim's goals encompassed unmasking the corrupt, the swindlers, the shady, including the malleable courts, corrupt lawyers, and the compromising of court officers, referees, judges, as well as the corrupting of any others in control of our destiny or our everyday lives. Jim believed 'scams' must be exposed and 'disrobed' for all to see, thus, SCAMRAIDERS.

**Boys From Brooklyn**



Born in 1939, Jim lived in Bay Ridge, Brooklyn. Growing up he observed the political antics surrounding his father. From about age 5 from his home on Shore Road he saw it all. Jim's dad was an important orchestrator of the Kings County Political Machine, then controlled by John R. Crews, the Boss Tweed of the 1940's. Crews ran the town, controlled courts, businesses, even gas rationing during wartime and virtually everything else including all



political and judge appointments. Jim watched and listened to these maneuvers orchestrated by Crews and a kaleidoscope of others. Tom Dewey, Governor of New York; Leonard Hall, Republican National Chairman; L. Judson Morehouse, Republican State Chairman; William O'Dwyer, before, during and after becoming New York City Mayor; dozens of judges; Crews' ADC Tony Durso;

**Bill O'Dwyer**

Police Commissioners; and Marty Epstein,



New York State Liquor Chairman and many others. (These politicos met with Jim's dad at his home 3-4 times a week) Jim's father was soon to be Commissioner of US Customs compliments of President Eisenhower and Crews. When Crews spoke, all listened. Most judges even Mayors were beholden to Crews & Company. "From a court fix to a city contract to help with the Gambinos or Anastasia, Crews was the man to see." Jim took it all in.

### Roy M. Cohn and Pals





In 1957, when Jim was 18 years old, he met and became pals with Roy M. Cohn, at the fabled Stork Club in New York City, run by impresario Sherman Billingsley. Through Billingsley while at the Stork, Jim met and became a friend of Walter Winchell the celebrated columnist who made his night-time office at the Stork Club

**Len Hall**



John Crews, Center, with Gov. Tom Dewey

while preparing his power-house syndicated daily column for press. Jim often would sit with Winchell in the Cub Room at the Stork and absorb all of the 'goings on' and who Winchell was going to 'pick or pan'. Roy Cohn was already well known as Senator Joe McCarthy's aid and as a prosecutor, and by that time an attributed rival of now New York DA Robert Morgenthau, who still runs an unusually efficient law enforcement office in Manhattan. Roy and Jim remained pals until Roy died. Roy always said, "I don't need to know the case, I need to know the judge." Jim watched for years Roy dispense 'brown paper bags' to many at 60 Centre Street (Courthouse). Roy had more judges in his pocket than Don Corleone the Godfather. Critics of Roy Cohn's fault him for some of his reported activities, but Jim states that the judges on Roy's 'pad' were

Cohn & McCarthy

not forced to be bought. They wanted the money and dispensed their corrupt 'justice' grounded on their larceny and greed and to 'make their bones' for the 'old-boys' who put them in their robes in the first place. These judges and their 'sponsors' all paid homage to Roy at his annual birthday parties held usually in ballrooms in grand hotels in NYC. Jim saw firsthand how 'malleable' the New York Courts were by watching and listening to John R. Crews, Roy and others. Roy's



Roy with Joseph McCarthy

client list spanned from the Gambinos and John Gotti to the rich and famous.

Jim traveled to the Unified New York Courts with Roy on numerous occasions when Roy was to argue clients' motions. Roy, revealed to Jim that, "this group in black robes have the integrity of a cobra farm". In any event, with great aplomb, Roy entered each



The Stork Club



From left: Billingsley, Winchell, Runyon

courtroom crowded with other litigants (the 'brown bag' was previously in place). To the front of the line Roy strutted, and after greetings from the bailiff, "Good morning Mr. Cohn," blurted the justice.

When the sucker adversary began to dig in his heels -- as they say, money talks and BS walks --



The Stork Club, NYC

"No need to argue, I've read the papers, you will get my order in the mail" said the judge and onto the next court Jim and Roy went. Each was the same, except the judge was a different name, all recipients of Roy's 'Brown Bags'. Roy had no respect for the Unified Court players because he was able to put them in his pocket and pay for the access. They took his money and when he got sick, they went after the hand that fed them.



Walter Winchell



Sidney Korshak

Through Roy and friends Jim met Sidney Korshak and Greg Bautzer, both Beverly Hills lawyers. Their M.O. was a west coast version of 'Citizen Cohn' in NYC. Korshak was the legal 'front' for 'the boys' in Vegas and also had many judges in LA in his pocket. What Jim did not learn from Roy, he learned from this guy.

### L. Judson Morehouse Playboy Club Martin Epstein



By 1960 Jim's dad had become Commissioner of Customs appointed by President Eisenhower, thanks to Johnny Crews. His dad soon formed a business with L. Jud Morehouse, the Republican State Chairman who helped put Nelson Rockefeller into the governorship of New York. They had political connections 'ad nauseum'; opening doors for the many who needed and paid for "access", from

Bill Zeckendorf on down. They selected crony Martin Epstein to become State Liquor Authority Chairman with the blessing of Crews. Marty was 'in like Flynn'. Soon Gay Bars in New York City, which had a 'lid' on them, proliferated and were run by Gambino and Genovese who were dancing in the streets thanks to Epstein's

Jud Morehouse, far left

new tune.



Bill Zeckendorf



Jud Morehouse, 2nd from right

When Hugh Heffner (Playboy Club) wanted a liquor license for the soon to open Playboy Club in NYC, 'Epstein to the rescue'.

Epstein went to Jud, and a payoff was made. Enter Frank Hogan, then Manhattan District Attorney who bugged the Morehouse and Jim's dad's office, and opened a case on a "tip". All were called to the Grand Jury. Later Morehouse was tried and convicted, but before he served any day in the pokey, Nelson to the rescue and commuted Morehouse's sentence, Epstein got off also. Jim watched these acts of abuse of power and position as most courts sat on their hands. Yet again, Jim's father came out pure and clean.



Hugh Heffner

## "Boy Wonder of Wall Street" Edward M. Gilbert



Eddie Gilbert

During 1975, Jim met Eddie Gilbert through Gilbert's daughter Robin. Eddie was a cunning, shrewd, yet likable fellow who, according to an analysis by famous lawyer Edward Bennett Williams Esq. who later represented Jim in this matter, said, "Gilbert can hide behind a corkscrew". Gilbert, aka Edgar Ginsberg, who had previously served time for a prior swindle, had a deal an hour. Gilbert offered one of his 'deals' to Jim and Johnny Revson of Revlon, a partner of Jim's at the time in an investment company. Sadly, Eddie had his own plans. While promoting



Johnny Revson

Conrac, a promising New York Stock Exchange listed Company to Jim and Revson, Gilbert was dumping the shares while artistically and cleverly manipulating the price. After a while, the SEC came calling. Jim went to Milton Gould Esq. of Shea Gould. This law firm was during the 1950's through the 1980's was one of the most formidable in New York. Gould saw a clandestine opportunity. Milton made a 'deal with the devil', and manipulated to secure Couri's testimony for the SEC, tank Gilbert, and get off the hook a few of his Shea-Gould cronies who were involved in another unrelated swindle. A scheme lawyers still do often: serve up a dope client to get off a bigger fish or even 'tank' a client for bigger bucks. Jim's SEC testimony lasting many days, became front page on the Wall Street Journal



several times, and was a cornerstone of Gilbert's ultimate persecution by the US Attorney's office in New York. A careful analysis reveals that if it hadn't been 'perpetrator Gilbert', the Government would never have become involved. The case was otherwise a pittance, but the powers at the US Attorney wanted to put Gilbert in the pokey. Why? Who knows? Politics once again? Or maybe because Gilbert was a 'bad guy' and a target. Jim retained Lawyer Edward Bennet Williams, and reluctantly became a key Government witness, entered a plea to a matched trade and false statement to a Bank (had he held out, the Prosecutor admitted later, Jim would have been given full Immunity). Jim testified against Gilbert for about 21 days straight in Federal Court SDNY.

Gilbert was convicted on all counts. Jim successfully served a short probationary period and paid a fine of about $40,000. Jim learned how the Securities and Exchange Commission, the US Attorneys Office, and the Government functioned, front row. Gould surely sold Jim and Gilbert down the river, and Jim learned a valuable lesson. Don't trust any lawyer and "watch your pockets". Jim reports that Gilbert was a brilliant, resourceful man who wasted his, Jim's, and Revson's talents on Conrac activities. Since the Gilbert Case, or before it, Jim has never been charged with any criminal felony or misdemeanor, whatsoever.



Floor of the New York Stock Exchange

## Single Parent



After all of this, by about 1982, Jim confirmed that his then wife Carla was a chronic alcoholic. He also learned while he was seeking custody of his 6 year old daughter, the very US Attorney who Jim aided in the prosecution of Gilbert had recruited his sick wife. "Wired her up" to try and illicit various admissions from Jim. The absurd scheme failed. Jim then persevered and obtained sole custody of his daughter while before JSC Sandra Miller in White Plains, NY Unified Family Court. Jim explains that Judge Miller, now in the Appellate Division in Brooklyn, NY, exhibited a unique, fair and keen understanding; and after JSC Miller ordered about a dozen evaluations by psychiatrists, psychologists, etc. of Jim and his wife and child, the court issued an Order appointing Jim Sole Custodial Parent to care for his daughter. The 6 year old is now 30, has graduated high school, college, and obtained Masters Degrees, all with honors. Jim points out that are a few judges who really try to administer fair and proper justice within a cesspool of injustice, bias, corruption, and greed. Roy Cohn's description that the Unified Court System is like a cobra farm seems to be right on the money.

## US Bankruptcy Judge Howard Schwartzberg



Jim in about 1990 was a large creditor of a Corporate Debtor. Another creditor attempted to buy the Estate of this debtor, which Jim opposed vigorously by oral argument before the Court. Jim is not a lawyer.

Judge Schwartzberg was impressed by Jim's legal presentations and tenacity and appointed him Trustee in the case (calling the non-lawyer appointment 'Sole Representative'). Jim learned how to write legal pleadings, litigate and make motion after

motion, the foundation of Bankruptcy Litigation. After 4 years Jim secured about twenty fold, for the benefit of the Estate, of what it would have been sold for. This is where Jim learned how, as a non-lawyer, to write pleadings and argue motions, by trial, error, and persistence. Jim reports that Judge Schwartzberg was a superlative Justice, fair and unbiased, who has now passed away and who administered the Texaco bankruptcy case from beginning to end.

U.S. Bankruptcy Court Building

## Pro se Litigation



Jim learned the ropes in the courthouse and used his tenacity and life-training to pursue his rights in various of his own court cases on his own behalf and as an assignee. He applied his knowledge of experiencing firsthand court antics, manipulation, corruption, and his ability to present facts in court formats. Armed with his storehouse of knowledge and facts spanning from John Crews, Roy Cohn and others from Brooklyn and NYC, Jim began to observe and assemble patterns of conduct perpetuated by lawyers, prosecutors, Courts, judges, referees and others involved in the court

systems and in law enforcement. It painted a picture that is not for the faint of heart. As an example, many lawyers deal in intimidation, tampering extortive acts, bribery, abuse and corruption. One lawyer, Jay Itkowitz, casually calls it "Gamesmanship". The name of the legal game is 'win at all costs and cheating in ok'.

As certain litigations developed Jim began, because of these experiences, to see curious patterns of bias, manipulation of facts, intimidation, and certain Courts ignoring Statutes, the law, due process, and worse. Many Courts at first perceived Jim as a "lowly pro-se" non-lawyer, who could be pushed around and manipulated, but he endured and watched and built an arsenal of data, of corrupt and suspicious activities, spanning from Westchester to Brooklyn and New York. The Courts and underlying evidence supports that litigants are being abused and manipulated and that the Courts are tainted. If you get to the right guy (an 'expediter', a 'rabbi', a 'facilitator', a 'Crews'), you own all of them as they are linked together like a chain gang. Remember, as Roy Cohn said, "I need only to know the judge." Sadly, most judges are stooges for the 'Machine'-the 'Old Boys' who put them

in the 'black robes', and most have chosen 'the almighty buck instead of Almighty God'. After a few weeks of Judge School the new appointees are 'good-to-go' to their respective Courtrooms ready to follow the orders of the John Crews's of the day. Honor succumbs to greed and corruption. Jim is also quick to point out that while corruption is rampant in the New York Unified Courts, as he and others have documented for years, there have been and are many judges that are fair, just, and honorable, and who will not partake in these corrupt schemes. Jim confirms that the materials he has assembled comprise New York Unified Courts, and not Federal Courts where Jim has found thorough and correct administration. Regretfully a proper judge in State Courts usually succumbs, or end up like Serpico, the NYC cop who was almost murdered for 'blowing the lid' off NYC corruption during the 1950's.

## Value to Law Enforcement

Over the past 30 years, Jim has also helped Law Enforcement and the Criminal Division of the Internal Revenue Service in developing and prosecuting numerous cases. During the 1980s, Jim aided in the development of the New York City Park Violations Bureau scandal, Bernard Sandow, Michael Burnett, Queens Commissioner Mannes and others. Jim uncovered along with others, the corrupt activities of Brooklyn's Surrogates Court and Judge Michael Feinberg and his "activities" with attorney Seth Rubenstein, and others. Feinberg's bias

and corrupt decisions involving Jim and his Aunt's Estate, represented by Rubenstein, spawned Jim's interest. Feinberg was also coincidentally observed by Jim buying tens of thousands of dollars (cash) in fancy duds at Bergdorf-Goodman often weekly with a salesman who was a friend of Jim's. This conduct didn't help Feinberg, a now disbarred Judge, and a documented crook. Jim's activities also have aided the uncovering of corrupt lawyers engaged in criminal activities, bribery and even murder (i.e., Howard Krantz and Michel Burnet). Jim also uncovered and spawned a major Criminal Internal Revenue investigation into Leona Helmsley's Carlton House on Madison Avenue and 62nd Street where an illegal gambling casino was actively operating, day and night on the 9th floor of that building; and protected by

Helmsley Enterprises' 'fancy', larcenous lawyers, and others being paid off to 'shut-up'. The CID of The Internal Revenue Service "staked-out" the gambling casino and the Carlton House for months based upon the information provided to them by Jim. Additionally, Jim has been involved in various other investigations and prosecutions involving the corrupt, scam-artists, tax evaders, and other wrongdoers; some are still active.

## Summary

All of the foregoing forged Jim's unique insight into human behavior and its' frailties, even his own. Now age seventy, Jim has lived through tremendous life-lessons. In addition to the above, he started his work career at age 15 with a photography business. At about age 20, in 1959, after working on Wall Street while attending Columbia University at night, Jim formed his own investment and consulting company. Jim was a founder of numerous companies, including during the 1960's creating and financing International Duty Free Corp and Duty 

Free International Corp, with his father. During his career Jim has also been the recipient of many accolades, including the Senatorial Medal of Freedom, and the Republican Congressional Committee Medal of Distinction. Moreover, he has assisted in various forms of Tax Reformation. In 2006, Jim attended coordinated classes and became a Court Appointed Special Advocate (CASA), for the aid of foster children.

Currently, though fighting health issues, Jim's focus is keenly directed to "using my life experiences to assist and teach others", and to "bring to light and to eliminate the loopholes that have allowed corrupt activities, not just in the Courts, but wherever injustice flourishes; and to expose the unethical".

- James Couri Awarded Republican Senatorial Medal of Freedom

- James Couri Honored as 2006 Businessman of the Year

- James Couri Appointed to Congressional Business Comission

- New York Times Article

- James Couri Appointed to Presidential Business Commission

Letter of Appriciation from President Richard Nixon to Jim Couri



Letter to Congressman Tom Delay from Couri re: IRS/Debt Collection

Share Twitter Facebook

**Welcome to
Scamraiders**

## Sign In



Terms of Use



© 2013  Created by Scamraider.

Badges  |  Report an Issue  |  Terms of Service

# E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x   :
LYDIA ALEXANDRA COURI                      :  **12-CV-2220 (TPG)(FM)**
                                           :
                          Plaintiff,       :
                                           :
                                           :  **DECLARATION OF JAMES C.**
             vs.                           :  **COURI**
                                           :
McLAUGHLIN & STERN, LLP, and               :
JON PAUL ROBBINS, ESQ.,                    :
                                           :
                          Defendants.      :
-----------------------------------------------------------x   :

James C. Couri, declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am over the age of 18 years.  I submit this Declaration to advise the Court of certain facts.  I am personally familiar with all of the facts stated herein.

2.      I am the father of plaintiff LYDIA ALEXANDRA COURI.  I have read the Complaint and am familiar with it and the exhibits annexed thereto.  The Complaint contains a number of allegations that are false, several of which are addressed herein.

3.      Contrary to the allegations in the Complaint, in November 2010, I did not believe that I would shortly be dying from melanoma cancer.  At that time, my cancer was in remission as a result of treatment that I had received in a clinical trial that I entered earlier that year.  I have provided true and accurate copies of certain medical records to the defendants to be disclosed pursuant to the Stipulation and Protective Order demonstrating that fact, which are annexed hereto as Exhibit A.  I had conversations with the plaintiff in November 2010 in which I informed her that I was in remission and she knew at that time that I was not expecting to die in the near future.  I never told plaintiff in November 2010 that I expected to die soon.

4.      I never made a death bed confession to the plaintiff as alleged in the Complaint as to what I or defendant Jon Paul Robbins allegedly had done with regard to the Lydia Alexandra Couri 1989 Trust (the "1989 Trust"). I never told  the plaintiff that I misused the money from the 1989 Trust. I never told her that I was a "charlatan."

5.      During the time period when Robbins made advances from the 1989 Trust, I had incurred financial obligations for my business activities, and I was therefore unable to timely pay the expenses for my daughter's obligations, such as her schools, camps, and medical insurance. I had no liquid funds to pay these expenses. The funds from the 1989 Trust were needed to support and maintain the plaintiff because there was no other source of liquid funds available. That is the sole reason that I asked Robbins to make disbursements from the 1989 Trust.

6.      I financially supported the plaintiff during the course of her life. The only time that I was not financially able to support the plaintiff was the time period during which I requested that Robbins advance 1989 Trust funds for her support and maintenance.

7.      All of the advances that Robbins provided from the 1989 Trust inured to the plaintiff's benefit.

8.      I never told Robbins that if he refused to make advances from the 1989 Trust that I would not pay his firm's legal bills. I never told Robbins that if he made advances from the 1989 Trust, that I would pay his firm's legal bills. I never told Robbins that if he made advances from the 1989 Trust that I would hire him and his firm to do legal work for me or for any company with which I was connected.

9.      In or about 1999, I requested that Robert Modansky, an accountant, and his accounting firm prepare a valuation and report of Couri Acquisition Corporation stock, for Marlene Couri's gift tax purposes. The defendants had no involvement with the request,

2

preparation, creation or use of the valuation, nor did Robbins participate in obtaining the valuation report.

10.     In May of 1999, I had advised Robbins that I had gifted Couri Acquisition Corporation shares to another trust that I had created, the Lydia Alexandra Couri 1998 Trust (the "1998 Trust"). The plaintiff was the beneficiary of the 1998 Trust.

11.     I prepared an agreement, dated May 21, 1999 (the "May 1999 Agreement"), memorializing, among other things, a gift of 125 shares in Couri Acquisition Corporation that I made to the 1998 Trust. I purchased these 125 shares for the plaintiff's benefit with my own money for approximately $130,000 in cash; I did not use funds from any other source to purchase the 125 shares. Robbins did not ask me to prepare the May 1999 Agreement, nor did he draft it. The only sentence that he prepared in the May 1999 Agreement is the sentence stating that he was consenting to it solely with respect to the assignment to the 1998 Trust of obligations I had to the 1989 Trust. I gave plaintiff another 10 shares of Couri Acquisition Corporation that I held as custodian for her. I paid $23,510 in cash for the 10 shares. In July 1999, plaintiff gifted those 10 shares to the 1998 Trust. I paid in excess of $150,000 in cash for the 135 shares.

12.     In or about the spring of 2000, I shared a copy of the valuation report with Robbins to demonstrate to him that the shares in Couri Acquisition Corporation had real and significant value.

13.     In January of 2000, I paid Robbins' firm the sum of $25,000.00 and in February of 2000 I paid Robbins' firm another $25,000.00. This was not a bribe to induce Robbins to breach his fiduciary duty to the 1989 Trust. I wanted to re-establish an attorney-client relationship with Robbins and his firm, and I agreed to pay the $50,000 in satisfaction of

3

amounts Robbins' firm had paid in 1993 in connection with the settlement of certain disputes. When I agreed to make these payments, Robbins and his firm agreed to re-establish our attorney-client relationship.

14.     At the August 16, 2012 conference before Judge Griesa, plaintiff's counsel stated that he was concerned that the defendants and I have entered into an agreement to compensate me in return for my cooperation. That statement has no basis in fact and is outright false. I never asked for any such compensation and there is no agreement to compensate me. In addition, Mr. Folkenflik scurrilously and falsely stated without any basis in fact that I and Robbins looted and wasted the 1989 Trust.

15.     I have read this Declaration prior to signing it and swear to the truthfulness of its contents.


Dated:  La Quinta, California
       December 22, 2012


_____
James C. Couri

**F**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x    :
LYDIA ALEXANDRA COURI                          :    **12-CV-2220 (TPG)(FM)**
                                                                       :
                    Plaintiff,                              :
                                                                       :    **SUPPLEMENTAL DECLARATION**
        vs.                                                    :    **OF JAMES C. COURI**
                                                                       :
McLAUGHLIN & STERN, LLP, and                :
JON PAUL ROBBINS, ESQ.,                      :
                                                                       :
                    Defendants.                        :
-------------------------------------------------------------x    :

        James C. Couri, declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the

following is true and correct:

        1.        I am 74 years old and suffer from several serious medical conditions. I submit

this Supplemental Declaration to advise the Court of certain facts. The facts stated herein are

true and correct to the best of my present knowledge, information and belief, and are based upon

my best recollection of events that occurred over a period of more than thirty years.

        2.        I am the father of plaintiff LYDIA ALEXANDRA COURI. I have read the

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Sanctions (the

"Plaintiff's Memo in Opposition"), the Declaration of Max Folkenflik in Opposition to

Defendants' Memorandum of Law in Support of Their Motion for Sanctions (the "Folkenflik

Declaration"), and the exhibits annexed thereto. The plaintiff's opposition papers and the

Folkenflik Declaration contain a number of allegations and facts that are false, several of which

are addressed herein.

        3.        Set forth herein are two chronologies that respond to the allegations in the

Complaint, the Plaintiff's Memo in Opposition, and the Folkenflik Declaration. The first is a

chronology of events leading up to the lawsuit that resulted in the creation of the Lydia

Alexandra Couri 1989 Trust (the "1989 Trust"). The second chronology itemizes the various financial support that I paid or caused my wife Marlene Couri to advance to support and benefit the plaintiff, or that I caused my former wife Carla to pay as repayment for the $200,000 described in paragraphs 7 and 8 below.

4.    Contrary to the assertions of plaintiff's counsel, the below is evidence that I continually cared for and supported my family, and in particular cared for my daughter, whom I love dearly.

*Chronology of Relevant Events Leading up to the Lawsuit Which Resulted in the Creation of the Lydia Alexandra Couri 1989 Trust*

5.    I married the plaintiff's mother, Carla, in 1976.

6.    The plaintiff was born on November 20, 1978.

7.    Shortly after the plaintiff was born I entered into an agreement with Carla which resulted in my giving Carla $200,000, so that Carla would give that money to the plaintiff. The $200,000 was to be maintained for the plaintiff's benefit at one bank and two separate brokerage houses. The money was kept in Carla's name as the custodian.

8.    Around this time, Carla unfortunately began chronically abusing drugs and alcohol. Carla ultimately took the $200,000 and spent it.

9.    In 1981, I entered into an information with the United States Attorney's Office for the Southern District of New York, pleaded guilty to a matched trade and to making a false statement to a bank. This was a plea agreement pursuant to which I became a key witness for the government in an important securities case.

10.    In or about September 1981, I was commended by Assistant United States Attorney Jeffrey Livingston in a letter to former United States District Judge Morris Lasker for my cooperation and truthfulness in three related trials. Mr. Livingston noted in his letter that



2

virtually every important aspect of my testimony was corroborated in great detail by the testimony of other witnesses and myriad documents. Mr. Livingston also noted that I was a great value to law enforcement.

11.     Annexed hereto as Exhibit A are true and accurate copies of excepts of a letter sent to former United States District Judge Morris E. Lasker by Assistant United States Attorney Jeffrey Livingston. The first page of Exhibit A is a copy of the excerpt I submitted to this Court as an attachment to my Motion to Intervene and for Other Relief, dated May 17, 2012. The second page of Exhibit A is a copy of the excerpt that I sent to Peter Alkalay of McLaughlin & Stern, LLP.

12.     In 1982, with my assistance and at my urging, Carla entered The Smithers Institute to treat her addiction.

13.     By 1986, Carla's addiction problems had become extremely serious and were jeopardizing the plaintiff's welfare. Carla disappeared with the plaintiff and took her to a homeless shelter. To protect the plaintiff, I initiated a proceeding in the Family Court, State of New York, Westchester County to obtain sole custody of her.

14.     The custody action was presided over by Hon. Sondra Miller, who was later elevated to the Appellate Division, Second Department. During the litigation Judge Miller demanded that I undergo an extensive background check and a psychiatric examination. I advised Judge Miller of my guilty pleas referred to in Paragraph 9 above. I have not been charged or convicted with any crime since that time. I underwent a psychiatric examination by Dr. Kendon W. Smith, who at the time was the Chief of Psychiatry at the Westchester County Medical Center. Judge Miller also required that the plaintiff and her mother undergo extensive psychiatric examinations. In addition, the plaintiff was interviewed *in camera* by Judge Miller.

Judge Miller came back into court and stated that the plaintiff had told her that the plaintiff

wanted to be with me. Pending the ultimate determination, Judge Miller appointed me sole

temporary custodial parent. I was able to take plaintiff home to a stable environment and she

resumed attending Greenwich Academy.

15.     The court ordered that I was to permanently have sole custody of the plaintiff, to

which Carla had previously consented to at the hearing. I was also recommended by Dr. Kendon

W. Smith to have sole custody. Annexed hereto as Exhibit B is a true and accurate copy of an

excerpt of the August 25, 1986 Permanent Order of Custody issued by Hon. Sondra Miller in

Carla Couri v. James Couri, Docket Nos. V-686-86; 0-867-86, New York State Family Court,

Westchester County. Exhibit B is a copy of the excerpt that I submitted to this Court as an

attachment to my Motion to Intervene and for Other Relief, dated May 17, 2012.

16.     In 1988, I married Marlene Couri, to whom I remain married to this day.

17.     In 1989, I assigned to the plaintiff my claim against my brother John Couri

concerning ownership in stock in a company then known as Duty Free International ("DFI"). I

retained Alkalay Handler Robbins & Korn – a predecessor of defendant McLaughlin & Stern,

LLP – to represent the plaintiff against John Couri in this matter, the settlement of which resulted

in the creation of the 1989 Trust.

### *Chronology of Financial Support that James Couri Paid or Caused to be Paid to the Plaintiff*

18.     During the period 1978 to 1986, I paid the following to support the plaintiff:

- Baby nurse and childcare costs, approximately $30,000;
- The gift of $200,000 described above in paragraphs 7 and 8;
- A gift of $40,000 to the plaintiff for the years 1978 through 1982 made pursuant to the Uniform Gift to Minors Act;
- In or around May 1981, I assigned an additional $200,000 for the plaintiff's benefit that was to be maintained in an investment account at Brean Murray;
- Medical insurance costs, approximately $40,000;
- Clothing costing approximately $10,000;

4

- Summer camp at the New York Athletic Club Day Camp from 1984 to 1986, totaling approximately $10,000;
- Greenwich Academy Country Day School Day Camp costs of approximately $3,000 per year;
- Tuition at the Greenwich Academy for school years 1984-85, 1985-86 and 1986-87 of approximately $13,665;
- Other costs associated with the plaintiff's matriculation at the Greenwich Academy, including uniforms costing approximately $2,500 and bus service to and from school costing approximately $1,500;
- The plaintiff attended nursery and pre-school at the Day School of the Heavenly Rest, which cost approximately $8,500; and
- Miscellaneous food and lodging costs of approximately $30,000.

19.     During the period of 1986 to 1989, I paid the following to support the plaintiff:

- Tuition at the Greenwich Academy for school years 1987-88, 1988-89 and 1989-90 of approximately $22,400;
- Other costs associated with the plaintiff's matriculation at the Greenwich Academy, including uniforms costing approximately $2,000 and bus service to and from school costing approximately $2,000;
- Medical insurance costs, approximately $18,000;
- Clothing costing approximately $12,000;
- Camp costs of approximately $10,000;
- Dental and orthodontist costs of approximately $2,500;
- Costs to treat the plaintiff's eyes, approximately $3,500;
- Childcare costs of approximately $20,000;
- Various art and dance classes costing approximately $5,000; and
- Miscellaneous food and lodging costs of approximately $25,000.

20.     During the period when Mr. Robbins made advances from the 1989 Trust, I or companies with which I was affiliated were owed certain receivables that I was unable to collect on. Certain money that was owed to me or the companies with which I was affiliated would be partially paid from time to time, and that money was used to pay mine and the plaintiff's current expenses and other obligations I had incurred. I always paid the plaintiff's expenses first from any money that came in. However, the amounts that I was able to collect were not sufficient to meet the plaintiff's needs and obligations I had incurred. That is why I asked Mr. Robbins to

make disbursements from the 1989 Trust, because there were no other liquid funds available to me to make necessary payments.

21. During the period of 1989 to 1993, I was able to pay the following from the amounts that I was able to collect to support the plaintiff. The figures below do not include funds disbursed by the 1989 Trust, all of which were made for the plaintiff's benefit, and which were made because I was unable to in a timely manner.

- Tuition at Greenwich Academy for school years 1990-91, 1991-92 and 1992-93 of approximately $12,500;
- Other costs associated with the plaintiff's matriculation at the Greenwich Academy, including uniforms costing approximately $2,500 and bus service to and from school costing approximately $2,500;
- The family medical insurance plan, costing approximately $12,000, which I paid from 1989 until around September 1990 and then again from July 1992 through 1993. The period from September 1990 through late 1992 was paid by the 1989 Trust;
- The plaintiff's doctor and dental bills of approximately $5,000. These funds were paid by me in addition to the funds disbursed by the 1989 Trust for this purpose;
- Bucks Rock Day Camp tuition and related expenses of approximately $17,500. These funds were paid by me in addition to the funds disbursed by the 1989 Trust for this purpose;
- It is my best recollection that approximately $15,000 was spent during this time period on the plaintiff's food and clothing costs, and that a portion of this amount was paid for by the 1989 Trust;
- Child care costs of approximately $2,500; and
- Various art and dance classes costing approximately $6,000.

22. During the period of 1993 to 1999, I paid or caused to be paid the following to support the plaintiff. The figures below do not include funds disbursed by the 1989 Trust.

- Bucks Rock Day Camp tuition and related expenses of approximately $15,000;
- Books for schools, costing approximately $1,500;
- I paid approximately $40,000 of the tuition for the plaintiff's matriculation at the Washington University of St. Louis. Other costs related with the plaintiff's matriculation and the balance of the tuition was paid by Carla as partial repayment of the $200,000 gift that she took from the plaintiff;
- The gifting of 135 shares of stock in Couri Acquisition Corporation, which cost me approximately $130,000 to purchase;
- The premiums on a $500,000 term life insurance policy on my life naming the plaintiff as the beneficiary, totaling approximately $10,000;
- Medical insurance costs, approximately $35,000;

6

- Dental and orthodontist costs of approximately $6,000;
- I paid approximately $27,000 for tuition and related costs of the plaintiff's matriculation at Miss Porter's School. Carla paid an additional approximately $40,000 towards these costs as a partial reimbursement of the $200,000 that she took;
- Clothing costs of approximately $18,000;
- The Sorbonne in Paris, approximately $15,000;
- Credit card bills of the plaintiff that I paid totaling approximately $30,000;
- The plaintiff was paid a salary by several companies with which I was associated of approximately $25,000;
- Car insurance costs of approximately $12,000; and
- Travel costs of approximately $10,000.

23.     During the period of 1999 to 2011, I paid or caused to be paid the following to

support the plaintiff:

- The premiums on a $500,000 universal life insurance policy (the term life policy was converted) on my life naming the plaintiff as the beneficiary, totaling approximately $80,000;
- A tutor for the plaintiff to complete her thesis at Stonybrook University, approximately $3,500;
- Books for school, approximately $2,500;
- Car insurance costs of approximately $18,000;
- Medical insurance costs, approximately $40,000;
- Housing costs for the plaintiff to live off campus at Washington University and Stonybrook University, over a six year period at both schools, approximately $70,000, including rent, phone and other miscellaneous expenses;
- Clothing costs of approximately $25,000;
- Credit card bills of the plaintiff that I and/or Marlene Couri paid totaling approximately $30,000; and
- Payments of approximately $3,000 to an accounting firm for services rendered on behalf of the plaintiff.

24.     As shown herein, the allegations made by Mr. Folkenflik that I willfully chose not

to support the plaintiff are blatantly false. I have always supported my daughter to the best of

my ability.

7

25.     I have read this Declaration prior to signing it and swear to the truthfulness of its contents.

Dated:  La Quinta, California
        February 21, 2013

James C. Couri

NEWYORK_DOWNTOWN\2550233\1

# EXHIBIT A

Laskar

In the late spring of 1980, when the Government position to obtain an indictment of Couri, Couri to plead guilty and cooperate. A copy of his letter ent, dated June 16, 1980, is submitted herewith as

Cooperation. Couri's cooperation with this Office extensive and of great value to law enforcement. icipation of testifying in the grand jury and in two. He has given a tremendous amount of time on weekdays, is and evenings. He has endeavored, we believe fully, to testify truthfully and to the best of his Virtually every important aspect of Couri's testi- been corroborated in great detail, by reference to my of other witnesses or to myriad trading records or documents. In the trial of Edward Gilbert, Couri ed for slightly more than five days. In the subsequent of John Revson and Ludwig Cserhat (Gilbert's principal Couri testified for more than ten days. As noted Gilbert was convicted and sentenced to four years ment. Revson and Cserhat were acquitted. Despite y, hostile and at times perhaps abusive cross-examina- in the Government's view, Couri did his best to each question properly and accurately. In short, cooperation in the Conrac case has been excellent, it has been taxing in terms of the pressures it has on him.

EXCERPT

should be noted, however, that the cross-examina- the Revson trial were made more difficult for Couri

Respectfully submitted,

JOHN S. MARTIN, JR.
United States Attorney

By: JEFFREY A. LIVINGSTON
Assistant United States Attorney
Telephone: (212) 791-0047

Williams & Connolly

Hon. Morris E. Lasker

In the late spring of 1980, when the Government was in a position to obtain an indictment of Couri, Couri agreed to plead guilty and cooperate.  A copy of his letter agreement, dated June 18, 1980, is submitted herewith as Exhibit A.

Cooperation.  Couri's cooperation with this Office has been extensive and of great value to law enforcement. In anticipation of testifying in the grand jury and in two trials, he has given a tremendous amount of time on weekdays, weekends and evenings.  He has endeavored, we believe successfully, to testify truthfully and to the best of his ability.  Virtually every important aspect of Couri's testimony has been corroborated in great detail, by reference to testimony of other witnesses or to myriad trading records and other documents.  In the trial of Edward Gilbert, Couri testified for slightly more than five days.  In the subsequent trial of John Revson and Ludwig Cserhat (Gilbert's principal broker), Couri testified for more than ten days.  As noted above, Gilbert was convicted and sentenced to four years imprisonment.  Revson and Cserhat were acquitted.  Despite grueling, hostile and at times perhaps abusive cross-examinations,* in the Government's view, Couri did his best to answer each question properly and accurately.  In short, Couri's cooperation in the Conrac case has been excellent, though it has been taxing in terms of the pressures it has imposed on him.

M&T Bank/Plaza Galleries.  The information which led to Couri's pleading guilty to making false statements to M&T Bank came to the Government's attention shortly after the Gilbert trial when employees of Plaza Galleries, a company owned by Couri, became concerned that the appointment of a receiver of that business in January, 1981 might lead

---

*    It should be noted, however, that the cross-examinations in the Revson trial were made more difficult for Couri because of the revelations, just after the Gilbert trial, concerning Couri's crimes and wrongdoing in the M&T Bank/Plaza Galleries matter, for which, of course, Couri must bear responsibility.

# EXHIBIT B

At a Term of the Family Court of
the State of New York, held in
and for the County of Westchester
at the Courthouse thereof, 111
Grove Street, White Plains, New
York, on the $25$ day of August,
1986.

P R E S E N T :

       Hon. Sondra Miller,
          Judge.

---------------------------------x
                    :
In the Matter of a Proceeding  :   Docket Nos. V-686-86
Under Article 6 of the Family   :           O-867-86
Court Act.                      :

CARLA COURI,                :
                      :
       Petitioner/Respondent, :     PERMANENT
                      :    ORDER OF CUSTODY
       -against-         :
                      :
JAMES COURI,                :
                      :
       Respondent/Petitioner. :
                      :
---------------------------------x

       The instant matter having come on before this Court
(Miller, J.) by Order to Show Cause, Petition for Custody,
Cross-Petition for Custody and Petition for an Order of Pro-
tection on         , 1986; and Carla Couri having appeared
personally and by her attorney, Barry Goldstein, and James Couri
having appeared personally and by his attorney, Peter Alkalay,

and Alexandra Couri having appeared by her attorney, Lucille Oppenheim; and all parties having consented thereto;

NOW, THEREFORE, it is hereby

ORDERED, ADJUDGED and DECREED that the father, James Couri, shall have custody of Alexandra Couri; and it is further

ORDERED, ADJUDGED and DECREED that the mother, Carla Couri, shall have the right to visit with Alexandra Couri one weekend per month, commencing at 10:00 AM on Saturday and terminating at 7:30 PM on Sunday (hereinafter the "weekend visitation"), with the following provisions:

(i) such visitation may take place at a hotel within New York or Westchester County selected by Carla Couri, subject to the approval of James Couri, which approval shall not be unreasonably withheld;

(ii) in the event the weekend visitation takes place at a hotel, James Couri shall be responsible for the cost of a single room with double occupancy, as well as

-2-

# G

To Paul Robbins

Re: Lynda Couri 1985 Trust.

Paul-
FYI - I know $7,500 is not a barrel of money but you may want to look into buying Microsoft for the Trust. It is a great company & in years to come you will make a lot of money in it (I think).

Regards.
JM

# JIM COURI

## FACSIMILE TRANSMITTAL SHEET

| TO: *Paul Rollins* | FROM: **Jim Couri** |
|---|---|

| COMPANY: | DATE: 5-3-13 |
|---|---|

| FAX NUMBER: 212-448 0066 | TOTAL NO. OF PAGES INCLUDING COVER: ② |
|---|---|

RE: *Dylla A Couri Trust 1989 -*

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY

NOTES/COMMENTS:

*I just found this in my records & I am sending it to you.*

1902faxcover

# H

# AFFIDAVIT

STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

James Couri being duly sworn deposes and says:

1. I make this Affidavit, now as a California resident, in my individual capacity, and as Trustee to the Trusts named herein as Secured Parties. I wish to affirm, confirm and ratify my unconditional and irrevocable secured personal indebtedness due to Marlene Couri (Marlene), Lydia Alexandra Couri (Lydia), Marlene Couri 1999 Trust (MCT), and Lydia Alexandra Couri 1998 Trust (LACT), collectively 'Secured Parties', representing loans, advances, guarantees and other of my obligations due to these Secured Parties from the years 1979 to 2010.

2. I have executed various Promissory Notes, Guarantees, and Security Agreements in favor of the above named Secured Parties. UCC Financing Statements and Amendments have been filed in both California and in New York States (James Couri, Debtor), evidencing these obligations. The first of the UCC Financing Statement was filed in NY State in 1999, and in California in 2009. I have executed current 'replacement' Promissory Notes, substituting any and all of the original 'Notes' that I

first executed in favor of the Secured Parties herein, that could be deemed 'stale',

memorializing my obligations due to the Secured Parties, because of my failure to pay

such Promissory Notes, all or in part, and they remain unpaid. I have computed Interest

and other agreed charges, as I deem fair and equitable to the Secured Parties, who have

also agreed to these sums that I owe.

3. In view of my health issues, I wish to further explain and clarify how my

obligations came into being, so that there can be no issues or dispute that each and every

Promissory Note and obligations due to the Secured Parties by me are unconditionally

valid, binding, and enforceable; and that all such sums are due and payable to the Secured

Parties herein (ie: Marlene, Lydia, MCT, LACT).

## AS TO MARLENE COURI

4. In 1989, Marlene sold her business, Manikin Manor Inc. Shortly thereafter,

Marlene loaned me $50,000.00 for personal use with interest compounded at 5% per

annum.

5. In 1990, Marlene loaned me $200,000.00 with interest compounded at 5% per

annum. Marlene also 'invested' $50,000.00 in JCC Capital Corp. in 1990. Such

investment I personally guaranteed, plus 5% interest, compounded annually.

6. JCC Capital Corp filed bankruptcy in or about 1991 in SDNY Bankruptcy Court. Marlene's investment in JCC Capital Corp was lost. I therefore became responsible to Marlene for my guarantee. JCC Capital Corp was Dissolved in 1993.

7. I thereafter in 1993 made a Gift to Marlene in the sum of $500,000.00, in consideration for her support, love, devotion, and affection to me; none of the Gift has been paid by me to Marlene.

8. In year 2000 Marlene made an investment in Couri Acquisition Corporation common stock at my insistence, in the sum of $650,000.00 and gifted those shares to MCT. I guaranteed this investment with interest at 5% compounded annually. Marlene filed Gift Tax Returns and I guaranteed the Gift Tax that she paid to the IRS and NYS, in the approximate sum of $30,000.00.

9. The Couri Acquisition Corp investment was lost, and Couri Acquisition Dissolved in 2008. I am accordingly responsible to Marlene for $650,000.00, plus interest at 5% per annum compounded annually.

### AS TO LYDIA ALEXANDRA COURI

$200,000.

10. In 1978 Carla, my previous wife and mother of Lydia made a gift to Lydia of $200,00.00 cash shortly after her birth in 1978. Carla filed Gift Tax Returns for this Gift in 1979, and paid any tax due. In 1980, this money belonging to Lydia ($200,000.00) was

subsequently borrowed by me with interest compounded at 5% per annum and used for

my personal and business activities. I therefore owe Lydia said $200,00.00 plus interest

from 1980.

*$ 200,000 ⁰⁰*

## AS TO LYDIA ALEXANDRA 1989 & 1998 TRUSTS

11. In 1991, I borrowed $175,000 from Lydia Alexandra 1989 Trust (Trustee Jon

Paul Robbins) for living expenses. These obligations were subsequently transferred in

1999 to LACT, such sums I still owe, plus interest at compounded at 5%.

## AS TO MARLENE COURI 1999 TRUST

12. I am the sole Trustee of the MCT. I borrowed sums from MCT from the year

1999 through the year 2009. I also guaranteed all of the losses and investments made by

the MCT; most of which I still owe. These sums total the agreed sum of $565,000.00

from year 1999, plus interest compounded at 5% per annum.

13. I have as Trustee of LACT and MCT, recently executed valid Assignments in

favor of Lydia and **Marlene** individually as beneficiaries to the Trusts, transferring all of

my personal obligations, guarantees, etc., due to the MCT to Marlene individually; and

all of my personal obligations, guarantees, etc., due to the LACT to Lydia individually;

including Assignment to them individually of all rights under the Security Agreements, Promissory Notes, Guarantees etc. Accordingly, Marlene and Lydia individually and as Assignees of the MCT and LACT rights, are the surviving Secured Parties, individually and as Assignees, and are the sole beneficiaries to my indebtedness outlined herein.

## SUMMARY

14. I have computed the interest and other agreed charges due to the Secured Parties herein attributable to my obligations to said Secured Parties. I have computed these sums from the dates of the commencement of the respective obligations and guarantees that I am indebted to pay. These computations have been agreed to by the Secured Parties herein, and are fair and correct. The accepted total of my obligations due to the Secured Parties herein is $9,200,000.00, as their interests appear, as of this date of this Affidavit. It is my intention and our mutual agreement that the Secured Parties, ie: Marlene and Lydia share equally, dollar for dollar, up to $9,200,000.00 plus all accrued interest compounded at 5% annually as to any of my assets, if any. The Secured Parties can, if the choose, Assign to themselves, pursuant to the Security Agreements, all or any of the Assets securing these obligations, at any time from the date hereof without any further Notice to me.

15. Much of the forgoing of my obligations to these Secured Parties are memorialized by various writings, Promissory Notes, Security Agreements, Assignments,

etc., and Gift Tax Returns filed by Marlene and Carla, etc., some filed in velo-bound volumes; but are all affirmed and confirmed here as valid and binding.

16. Most of these obligations due from me to these Secured Parties, ie: Marlene, Lydia, MCT, LACT are evidenced by UCC Financing Statements and Amendments, filed in both California and New York States, by Blumberg-Excelsior Corp at my request. Such filings commenced in New York State year 1999, and Amended thereafter. UCC Financing Statements and Amendments also have been filed in California State in the year 2009, when the Secured Parties and I became Residents of California in the year 2008.

17. I and the Secured Parties have been California residents and domiciliaries since 2008 and are filing Tax Returns in that manner since 2008.

18. This Affidavit, and all of its terms and conditions, the Security Agreements, Promissory Notes, Guarantees, duly executed and referred to herein etc.; including the relationships among the Parties, etc.; all shall be unconditionally governed by the Laws of the State of California. Any inconsistency as may be set forth in any Security Agreement, Note, Guarantee, or otherwise referred to herein- versus the terms and conditions in this Affidavit--- the Terms and Conditions in this Affidavit shall irrevocably prevail over any such other Documents.

19. Accordingly, all the forgoing indebtedness due from me to Secured Parties, ie:
Marlene, Lydia, MCT, and LACT, are irrevocably and unconditionally valid, binding,
and enforceable, as amended/assigned herein. The Secured Parties herein have valid and
binding first priority security interest and priority lien in any and all my assets, claims,
etc., if any, and subject to all the terms, conditions and rights under the Security
Agreements signed by me in their favor, and further confirmed in the current UCC
Financing Statement-Amendment filed in California, Filing Number: 10-72219328,
Document Number: 23869410004, File Date: 2-5-10, attached hereto.

James Couri

Sworn to before me this _____
day of February 2010.

_____
Notary Public

...bscribed and Sworn to before me on this
__15__ day of _February_, _2010_
By _James C. Couri_
Who proved to me on the basis of satisfactory
evidence to be the person who appeared before me
_____
Notary Public

KIM ALVAREZ
COMM. #1660511
NOTARY PUBLIC-CALIFORNIA
RIVERSIDE COUNTY
My Comm. Expires APRIL 25, 2010
BCA1  BCA1

Agreed and Consented to:

_Marlene Couri_
Marlene Couri

_____
Lydia Alexandra Couri

By: _____
Marlene Couri 1999 Trust, James Couri, Trustee

By: _____
Lydia Alexandra 1998 Trust James Couri, Trustee

I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
           Plaintiff,

          - against -

McLaughlin Stern LLP,
Jon Paul Robbins Esq. et al,
           Defendants.

CASE 12-CV-2220

AFFIDAVIT OF A. CARLA NATIONS
NATURAL MOTHER OF LYDIA
ALEXANDRA COURI

STATE OF MISSOURI
COUNTY OF GREENE

A. CARLA NATIONS being duly sworn deposes and says:

    1. I am the natural mother of Lydia Alexandra Couri (Alex).

    2. I am a recovering substance abuser having gone into rehabilitation thanks to my former husband James Couri's (James) persistence and tenacity, which resulted in an Intervention in 1982 and subsequent treatment at Smithers Institute in New York City and other facilities resulting in my sobriety for more than 17 years.

    3. I consented to James Sole Custody of Alex in 1986 and concentrated for about 7 years on my recovery.

    4. I reside in Springfield Missouri having remarried and now separated.

    5. I resumed contact with Alex in or about 1996.

    6. I have functioned as a substance abuse counselor, including at Care Unit Hospital, Fort Worth, Texas and am fully familiar with Alex and her activities since 1996.

    7. I regret this Affidavit, but I am desperately attempting to cause Alex to obtain treatment for her addictions and mental disorders at a qualified treatment facility such as Hazelton, Betty Ford, or The Meadows.

    8. Accordingly, I set forth some of my experiences with Alex (from 1996 through 2011) that confirm her substance abuses and addictions.

May-14-2012 09:53 AM US Bank 4178878506    3/4

05/12/2012  10:15    2100000000            2A                    PAGE  03/04

9. While Alex was visiting me in Missouri, an argument ensued which resulted in Alex physically attacking me at my home in my bedroom. This conduct spawned by Alex's substance abuse.

10. Thereafter, in my desire to try to continue to maintain and develop a closeness to Alex, I traveled from Missouri to California to visit with her. On the last two occasions, Alex became abusive, nasty, demanding, and argumentative sufficiently to a point that the situation became unbearable and frightening to me. As a result, I was forced to promptly depart and return to Missouri.

11. Further, Alex engaged in very inappropriate and sexual conduct with my now estranged husband Dan behind my back.

12. On one occasion, when Alex was visiting me on a Christmas holiday while I was separated from my husband Dan, Alex went to a bar and picked up and brought to my home a total stranger in the middle of the night while Alex was intoxicated apparently seeking a sexual encounter. I demanded the man leave. At that time, I begged Alex to seek substance abuse treatment. She refused.

13. Alex also again admitted to substance abuse to me, relating an incident while Alex was under the influence in the Ivy Restaurant in Los Angeles in the presence of her then boyfriend David DeSanctis and his parents.

14. In Aspen Colorado where I had paid for Alex's airfare and hotel, Alex became intoxicated and ordered a $400 steak in the presence of others forcing me into a corner of not being able to reject her selection. I paid the tab.

15. As recently as July 2011, I had just arrived for what was planned as a four-day visit with Alex in Los Angeles. Soon, after my arrival, Alex became more than abusive, acting irrational, glassy eyed and hyper (telltale signs of drug abuse). This incident was at the home of David R. Fisher Esq. Alex began out of the blue, a diatribe verbally attacking and accosting me in such a manner that I became terrified and alarmed. As Alex continued and her rant escalated I became shaken and scared. I decided for my safety and based on her behavior and threatening utterances, it was best that I promptly depart for a hotel. Thereafter, I secured a taxi, went to the Sunset Tower Hotel and left the next morning for my home in Missouri. Since that time, I have not seen or spoken to Alex.

16. Some time ago, I personally secured a $500,000.00 life insurance policy on my life with Alex as beneficiary; done so out of my love for my daughter. As a result of Alex's continued pattern of horrible activities, substance addictions, and her unwillingness to allow us to aid her to seek help, I decided to terminate this insurance policy, which I recently have done.

May-14-2012 09:53 AM US Bank 4178878506

05/12/2012  10:15    2100000000                    2A                          PAGE  04/04

17. I also wish to disclose that after agreement with Alex's Father James, I paid approximately $160,000 towards Alex's tuition at Washington University (1997 - 2001). I also, along with James, expended for Alex's lodging and other college expenses. Furthermore, I spent and paid to and for Alex additional sums for her expenses and lifestyle, clothing, and other tangibles from time to time during the periods 1996 to 2011.

18. There is no question, based on my training and first hand knowledge of substance abuse and addictions, my observation and interaction with Alex reveal that she regretfully inherited my genetic makeup. Alex is sadly addicted to substances and alcohol. I have observed Alex while she was under the influence of drugs and/or alcohol, conduct that I am regretfully fully familiar with. Alex's behavior (under the influence) is not dissimilar to mine while I was an addict. Alex, as I could during my addictions, is able abstain for brief periods and falsely appear normal. Please do not be fooled: she is not.

19. I make this Affidavit with a heavy heart and love for my only daughter Alex. I hope and pray that this Court will take steps to seek Alex's evaluation and prescription records, as without that and prompt treatment in an accredited facility, I fear for Alex's wellbeing and life.

A. Carla Nations

Sworn to before me this 14th
day of May 2012.

Notary Public



CYNTHIA M. CREWS
Notary Public
Greene County
My Commission Expires
Jan. 15, 2015
Commission #1056182

cc: All Parties

