UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 10/14/14

---

LYDIA ALEXANDRA COURI,

            **Plaintiff,**

    -against-               **CASE: 12-CV-2220 (TPG)**

MCLAUGHLIN STERN LLP AND
JON PAUL ROBBINS ESQ.,

            **Defendants.**

---

## DISCLOSURE AFFIDAVIT OF JAMES COURI
## FATHER & ATTY IN FACT OF PLAINTIFF,
## WITH EXHIBITS

---

**JAMES COURI,**

**Pro Se**

**78365 Highway 111
La Quinta, CA 92253
760-346-2808**



# JAMES COURI

78365 Highway 111, Suite 322, La Quinta, CA 92253 . 760-346-2808

Office of The Clerk                          Oct 11, 2014
US District Court SDNY
500 Pearl Street
NYC NY 10007

Re Case #
12 - CV2220
J Acouri v McGuykin Stern
Paul Robbins.

Ref: Discovery Aff with
Exibits from Jims Couri

Dear Clerks Office:

Enclosed please find Jims Couri Aff &
Exibits and Aff of Service regarding the above
Case (Original Document)

Please be kind enough to File the Aff &
Exibits, Post on Pacer and "Stamp" the
Enclosed Copy of the Cover Page & Return to
Me in the enclosed PrePaid envelope.
All parties have been served (See Aff of Mail)

                          Thank You

Enclos:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
                    Plaintiff

            - against -

McLaughlin Stern LLP and
Jon Paul Robbins Esq.,
                    Defendants.

12-CV-2220 (TPG)

DISCLOSURE AFFIDAVIT OF
JAMES COURI, FATHER & ATTY
IN FACT OF PLAINTIFF, WITH
EXHIBITS

STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

James Couri (Couri) being duly sworn deposes and says:

1. After careful review of the true facts surrounding this Case, and the gravity of my medical
condition, in part due to the recurrence of Stage Four Melanoma Cancer, revealed after PET-CT
Scans taken at UCLA on 6-2-14, I have determined to present to this Court the chicanery,
Extrinsic Fraud, Perjury. Suborning of Perjury, extortion, and manipulation of my daughter
Lydia Alexandra Couri (Alex), by lawyer Max Folkenflik (Max) and his "partner" in this Case
David Fisher Esq. (Fisher).  I believe that I have assembled proof that Fisher and Max recruited
Alex to discredit me, malign me, deprive me of any right to defend myself, refuse to depose me,
and then lie to this Court in order to achieve their extortion scheme. In the process, Records have
been illegally used in violation of IR Code 7216 and the law. In a nutshell, the Complaint is a
sham, replete with made up fantasy belied by documentary evidence. Max and Fisher simply
recruited Alex a mentally unstable drug addict in a scheme to shakedown unjust rewards and
Defendants Insurer Ace.

## MY GRAVE MEDICAL CONDITION

2. Exhibit A is an Affirmation from UCLA Oncologist Professor dated 6-25-14. The name is redacted as in the past these lawyers (MAX and others) have harassed my healthcare providers. The Document is self explanatory and reveals the gravity of my health situation. Also please see Exhibit B the 6-2-14 Scan, and Exhibit C, UCLA Reports of 7-15-14 regarding my condition which includes "lung metastasis, lymph nodes metastasis, coronary artery disease, etc. Also see Exhibit D Affidavit dated 5-23-06 from Oncology Surgeon Michael Schafir who resected the first finding of Melanoma in 2006. Also please see Exhibit E, Affidavit from Dr. Thomas Reynolds outlining in detail my medical situation.

3. I am undergoing highly toxic Chemo-Immuno treatments now and have undergone two more surgeries since June 2, 2014 related to Stage Four Cancer. Although I am fighting for my life, I want to put facts and evidence before this Court which will establish that Max has lied and caused Alex to lie by secreting evidence or tampering with evidence illegally obtained and illegally used.

## BACKGROUND

4. Alex was born 11-20-1978. Her natural mother is Carla Totero (Nations). Unbeknownst to me at that time and later confirmed when Carla entered The Smithers Institute in 1982 for Drug abuse in NYC, Carla was confirmed and admitted to being a drug addict since she was about fourteen years old. I have all of the Smithers Records that reveal, in Carla's own hand that she was involved in years of bad acts, thefts, sexual misconduct and rampant drug and alcohol abuses. Carla submitted an Affidavit here Sworn-to by her 5-14-12, Exhibit F. Carla reveals a series of bizarre acts engaged in by Alex and witnessed by Carla.

5. In 1986 the situation with Carla became impossible after she disappeared wit Alex, and I then filed for Divorce and Sole and Permanent Custody of Alex, in White Plains NY. After months of Psychiatric evaluations and interviews, Judge Sandra Miller awarded me Sole Custody of Alex, on consent in Court by Carla and Alex. See Exhibit J, excerpt of that Order. Soon after Carla totally disappeared and remained so for over six years.

6. I devoted my life and time to Alex. I enrolled her into Greenwich Academy, and then Miss Porters School. I spent a fortune on her lifestyle. In 1988 I married Marlene, my present wife, who was a successful businesswoman. Marlene gave to Alex love, affection and money.

7. While at Miss Porters, Alex began to exhibit characteristics of Carla. In or about 1997 Alex was caught by Miss Porters staff using marijuana and other drugs on Campus along with a Sarah Ball. Alex was expelled and sent home. I intervened and implored Headmistress Burch Ford and others to give her another chance. After about a week of consideration the School did just that.

8. Alex asked me to try and find Carla. I hired an investigator and found her in Texas, married to a Dan Nations. Alex wanted to visit with Carla. Again, I devoted time and money meeting with them and securing Agreements and promises that Carla and Dan were "drug-free". This was a lie. Soon after, in 1997 Alex began to visit with Carla and during each visit I had Alex and Carla's assurance that all was "well'. After three years I came to learn by Alex Confession that she had been engaged in  a sexual relationship with Dan Nations for over three years while lying to me and Marlene. Further they were all engaged in not only sex but drug and alcohol abuse as well. I could not face how my daughter lied to me about this horrible situation, and I was still unable to face the truth that Alex was then and is now a drug abuser, a liar and without integrity.

ALEX CONSTANTLY SEEKING A "BAIL-OUT" AND "FREE-RIDE"

9. During the relevant times I did everything to protect and secure Alex. I respectfully refer the Court to Exhibit O, my letter to my brother John Couri dated 12-12-13 relating to the background leading up to the creation of the LA Couri 1989 Trust. All of this is well documented but hidden by Alex's charlatan lawyers. The money was owed to me by my brother and I, in 1989, assigned it to Alex and the paid Attorney Robbins to sue John on behalf of Alex.


10. Thereafter, I wanted to be sure that Alex Taxes were paid and her bills paid so I became her Attorney-in-Fact pursuant to a Durable POA Exhibit H and a POA at Chase Bank Exhibit I. I paid all of Alex CPA bills and all her taxes that were due. I signed all her checks. All of this she welcomed and thanked me for. For the Record, neither of these POA's have ever been terminated according to law by Alex. Alex is now simply a puppet and stooge for Max and Fisher. I append an Affidavit from Marlene Couri as Exhibit G further outlining the unstable and bizarre acts of Alex. A careful review of the Carla Aff and Marlene's Aff reveals that Alex is a unstable person, a drug abuser, a liar and highly irresponsible, and in need of rehabilitation. Alex is incapable of making significant decisions on her own based upon her history. Alex has caused herself to be involved in reckless acts of over spending, filing false Unemployment Insurance Tax forms, buying thousands of dollars in Skin Care products from Sonia Dankar without money in the Bank to pay for the items. I had to bail her out again.


DAVID FISHER ESQ. OF FISHER AND WOLFE ESQS.

11. The first I ever heard of David Fisher Esq. (Fisher) was in or about mid 2009. Alex called me and read me a letter from Fisher and Wolfe Esq.s to Alex, signed by Fisher. The letter accused Alex of "Theft" of David Desinctis credit cards and thefts of thousands in unauthorized charges for a diet program, handbags, woman's shoes, dresses, etc. The letter further accused Alex of

hacking into Desinctis computer and hacking and tampering with Desinctis Emails. Fisher threatened to file charges and file suit. Alex claimed that the claim was a lie. She begged me to call Fisher, which I did. Fisher began a diatribe of threats, abuse and extortion. I reminded Fisher that Alex and Desinctis were emotionally involved and had traveled together to Asia. I also reminded Fisher that Desinctis was being charged as a "Art Thief". That was the last I heard about that Fisher scam.

12. I later learned that Alex was doing part-time work for Fisher. Alex invited me to Fisher's house where she was "house-sitting. In my own eyes I saw drug-paraphernalia in Fisher's bedroom. Alex admitted to me much about Fisher early on. Putting it bluntly Fisher is a fraud, a shakedown artist and a liar.

FACTS

13. A careful reading of Exhibit N points to a very different picture than Max wants the Court to see or know about. The complaint is a Poster-Child of Extrinsic and Intrinsic Fraud. The Complaint falsely states that Couri Acquisition Corp is a "Shell" Corporation without assets. This is blatant fraud. I append as Exhibit N, the Couri Acquisition 1999 first page of the Federal Tax return of that year, and during the relevant time. The return reveals on its face over $6Million in net assets at year-end 1999 and Income in excess of $1,100,000.00 for that year. Hardly a "Shell Corporation.  For the Record I refer the Court to Exhibit K collectively, which includes various awards and accolades about me. I have been of "Great Value to Law Enforcement", I was awarded the Senate Medal of Freedom and others.

14. Further to the forgoing fraud orchestrated by Max and Fisher is the false and absurd claim that in or about Dec 2010, I confessed to Alex (on my death-bed) that I and Robbins "stole her trust money".

15. First, by Dec. 2010 I was in partial Remission from Stage Four Melanoma Cancer and we were all elated.

16. Second, The money placed in the trust was mine that I assigned to Alex in the first place. See my letter to John Couri, Exhibit O.

17. Third, the post Dec 2010 actions of Alex prove that the alligation is absurd and belied by the facts.

THE FEB 25, 2011 ESCALADE CAR LEASE

18. To further show the previous closeness of my relationship with Alex in Feb. 2011, Alex offered to lease a new car for me knowing I had to travel weekly from the Desert to UCLA in Los Angeles, a two-hour drive each way. She decided on a new 2011 Escalade. On Feb. 25, 2011 Alex appeared at Jessup Cadillac with her then associate Tim Fleming and executed the Car Lease through Ally Financial for a 39 month lease at a rate of $656 per month. See Exhibit L collectively. It is worthy of note that the address Alex used for the lease and the DMV Registration was my office address in Palm Desert, CA. Further the Insurance was on my Policy also listing Alex.

19. From Feb. 2011 Alex never contributed a "red-cent" towards lease payments, maintenance, insurance or otherwise. It is clear as to what happened. When Max and Fisher were told about this by Alex they told her if she pays this car lease her case will be in the toilet. She was also told not to talk to me. Alex revealed this to Marlene.

20. I, Marlene and Marlene's daughter Pam helped make these payments thus building equity in the Lease. When I became ill in 2013 Ally sent Alex a Default-Termination. All the mail was

sent to Alex to my office. See Exhibit M. I worked it out with Ally and brought the Account current.

21. In June 2014 when I was told of the resumption of Stage Four Melanoma Cancer, I advised Alex, asking for her help as a daughter.

22. My reward was a call from a police officer that I returned from the Chemo-Center at UCLA. The officer told me that Alex and her lawyer Fisher told her that if I did not return the Escalade that they gave instructions to list the car as stolen on the Stolen-Car Data-Base. The officer said that whoever is driving the vehicle would be mandated to be arrested. I asked him if Alex gave that direction and he said yes, she and her lawyer did.

23. Under those circumstances and undergoing Chemo, I could not cause Marlene to be in that situation so I told the officer tat I would deliver the Escalade to Jessup Cadillac. I did so that afternoon although the payments were current and no "default' had occurred.

24. As can be seen I became a victim of theft and extortion by Fisher misusing a Police officer to rob the Equity in the Car. I was working an arrangement to buy the car as I, Marlene and Pam had paid about $28,000 in lease payments, not to mention new tires.

25. The more shocking is how a daughter can take such vicious and unconscionable acts on a father that she knows is terminally ill. I later have learned that Alex forged the name on my XM Satellite Account in the Escalade that I had just paid in full and she deviously cancelled the Account and had the money paid to herself.  It's sad to see my daughter now willing to do anything to her hands on money.

26. The proof here was the act of Alex in Feb 2011.  If I had told her I stole her money why would she be leasing a car for me?  Interestingly, I helped Alex buy and finance an Audi for her at about the same time.

SUMMARY

27. Sad as it is I have had to face much about my only daughter, who is willing to be manipulated by fraud and corruption to steal a few bucks by abusing the Court System. Alex needs medical care, not money. Please see Exhibit P, one of over 50 loving Notes and Cards from Alex to her Dad. Sadly, the call from the police about the Escalade forced me to face the truth as to what others at Betty Ford, Hazelton and other Rehabilitation Hospitals, and even Carla have stressed for years. Alex ix sick and a danger to herself and to society. I am too weak and distraught to do any more for her except to pray for her.

James Couri
78365 Highway 111, suite 322
La Quinta, CA 92253
Tel: 760-346-2808

Sworn to before me this _11th_ day
of October _OCT_ 2014

_____
Notary Public

NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016

UNITED STATES DISTRICT COURT

CASE: 12-CV-2220  (TPG)

Lydia Alexandra Couri,
                    Plaintiff,

                    - against -

AFFIDAVIT OF MAIL

McLaughlin Stern LLP and
Jon Paul Robbins Esq.,
                    Defendants.

_____

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

M. COURI being duly sworn deposes and says:  I am not a party to this case.

On Oct. _11_, 2014, I placed in a Depository controlled by Federal Express JAMES COURI'S

DISCLOSURE AFFIDAVIT & EXHIBITS to:

    (a)  USDJ Thomas Griesa - Chambers
        US Courthouse
        500 Pearl Street
        New York, NY 10007

    (b)  Cozen O'Connor
        Patrick Sardino Esq.
        45 Broadway
        16th Floor
        New York, NY 10006

    (c)  Max Folkenflik Esq.
        Folkenflik McGerety
        1500 Broadway
        21st Floor
        New York, NY 10036

Sworn to before me this
day of  Oct. 2014.

_____
Notary Public

M. COURI



NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016



## AFFIRMATION

STATE OF CALLIFORNIA
COUNTY OF LOS ANGELES

REDACTED          being duly sworn deposes hereby affirms as follows:

1. I am Assistant Clinical Professor Division of Oncology at UCLA Medical Center in Los Angeles, CA. (UCLA).

2. James Couri has been my patient since 2009 regarding his Stage Four Melanoma Cancer.

3. Mr. Couri was first diagnosed with Melanoma Cancer with lympho-vascular invasion in 2006. The sites were resected at that time. Thereafter, with the recurrence of Melanoma Cancer in 2009, Stage Four, Mr. Couri has been closely monitored at UCLA.

4. Due to the 2009 diagnosis of Stage Four Melanoma Cancer, Mr. Couri was told he had limited life expectancy. Mr. Couri soon thereafter underwent three surgeries at UCLA.

5. Following this, Mr. Couri underwent a lengthy program of toxic Immuno Therapy at UCLA during 2010.

6. From that time, Mr. Couri has been undergoing PET-CT Scans every three months and monitored carefully by me and UCLA's Oncology Staff and the UCLA Cardiology Staff as well.

7. On June 2, 2014, Mr. Couri underwent a PET-CT Scan at UCLA, which revealed the recurrence/resurfacing of active Melanoma Cancer, Stage Four.

8. Mr. Couri will be required to undergo immediate surgery, and promptly thereafter begin a lengthy program of Immuno Cancer-therapy at UCLA.

9. The Immuno Therapy has many debilitating toxic side effects, including severe disorientation, dizziness, nausea, severe rash, cardiac difficulties and many other disabling conditions that require constant hospital attention.

10. The treatment of Mr. Couri mandates careful monitoring and medical supervision at UCLA.

11. Mr. Couri's cancer condition is further exacerbated by his other medical disorders including cardiac, gastro-intestinal and other conditions.

12. In view of the forgoing circumstances, and the debilitating effects of the toxicity of the cancer Immuno-Therapy Mr. Couri is required to undergo at UCLA, Mr. Couri will be both physically and mentally unable to participate in daily activities for the foreseeable future.

13. The forgoing is based upon my teaching, training and experience, and the care of Mr. James Couri.

Dated: June 25, 2014                    REDACTED

B

Auth Prov: ~~[redacted]~~
Auth Prov Phone: ~~[redacted]~~
Auth Prov Fax: ~~[redacted]~~

# UNIVERSITY OF CALIFORNIA, LOS ANGELES

## Imaging Result

Name:
**Couri, James C**
Procedure(s) Performed:
**PET CT Body w Contrast**

DOB:
4/4/1939
Exam Date:
**06/02/2014**

Patient Class:
Outpatient
Reason for Exam:
**The patient with metastatic melanoma with lymph node metastasis, the last scan showed mildly avid left supraclavicular lymph node, palpated on the exam, restaging scan, schedule in June 2014**

UCLA ONCOLOGY IMAGING

EXAMINATION DATE: 2014-06-02 09:53:00

COMPARISON: PET/CT March 4, 2014

PURPOSE OF PET/CT:   Subsequent Treatment Strategy

CLINICAL HISTORY: 75 year old man with history of metastatic melanoma, nodal metastases, concern for left supraclavicular lymph node on prior examination. Chemotherapy completed 4 years prior.

REFERRING PHYSICIAN: ~~[redacted]~~

TECHNIQUE:
Imaging was performed on a Siemens Biograph 64 PET CT Scanner.  A single volume non-contrast CT of the upper abdomen was acquired in quiet breathing.  After the administration of intravenous contrast, volumetric CT scan of the chest was obtained in full suspended inspiration, and reconstructed at 1, 3 and 5 mm. Thereafter, volumetric CT was acquired from the base of the skull to the proximal-thighs during shallow breathing at 3 mm. After a standard uptake period following FDG injection, PET images were acquired, using multiple positions along the same length of the patient's body as the CT.  Iterative methods were used to reconstruct the PET images with a slice thickness of 2 mm.  The CT images were used for attenuation correction.

FDG Uptake Period: 47  minutes
FDG DOSE: 15.8 mCi F-18 Fluoro-Deoxy-Glucose
GLUCOSE: 113 mg/dl
Thoracic DFOV 43 cm

Oral Contrast: YES
IV Contrast: 115 cc, Omnipaque 350, Contrast Reaction: No

DOSE ESTIMATE:
The patient received the following exposure event(s) during this study, and the dose reference values for each are as shown (CTDIvol in mGy, DLP in mGy-cm). Note that the values are not patient dose but numbers generated from scan acquisition factors based on 32 cm (body, "a") and/or 16 cm (head, "b") phantoms and may substantially under-estimate or over-estimate actual patient dose based on patient size and other factors.

CT Abd wo (22a, 909); CT LungAbd w (26a, 1234); CT WB (23a, 2248);

_____

PET FINDINGS:

ONCOLOGIC FINDINGS:
Previously visualized left supraclavicular lymph node has increased in size and FDG avidity, now with SUVmax of 3.8, previously 3.4. An additional left lateral supraclavicular lymph node has increased in size, with now moderate FDG avidity, max SUVmax 2.2. Subcentimeter left level 2 lymph node demonstrates new moderate FDG avidity.  These findings are highly concerning for nodal metastases.

NON ONCOLOGIC FINDINGS:

Chest:
Status post right upper and right lower lobe wedge resection.  Slightly increased atelectasis of the right lower lobe adjacent to gastric pull through. FDG avidity is visualized at the right supraclavicular joint, degenerative in nature.

Abdomen/Pelvis:
No abnormal FDG activity is identified. There is no significant FDG avidity of the partially calcified, stable appearing mesenteric mass. Physiologic FDG uptake is noted in the visualized portions of the abdominal solid organs, gastrointestinal tract, both kidneys, ureters and the urinary bladder.

Musculoskeletal System:
There is no focus of abnormal FDG activity in the bones to suggest metastatic disease.

For SUV reference:
SUVmean/max liver: 3.4/3.8   (fused series 5  - image 201)
SUVmean/max mediastinal blood pool (measured at the descending thoracic aorta) 2.7/3.3 (fused series 5  - image 244)

CT FINDINGS:

ONCOLOGIC FINDINGS:
Slight interval increase in size of left supraclavicular lymph node, currently measuring 8 x 15 mm (5-265). A 5 mm (5-271) lateral left supraclavicular lymph node appears grossly unchanged in size however demonstrates new FDG avidity.

U C L A Health
## UCLA MEDICAL CENTER
### Clinical and Pathology Laboratories
Department of Pathology and Laboratory Medicine

10833 LeConte Avenue
Los Angeles, CA 90095

Phone:(310) 825-8947
Fax:(310) 206-4382

Jonathan Said, M.D.
Laboratory Director

## SURGICAL PATHOLOGY REPORT

| | | | |
|---|---|---|---|
| Patient: | **COURI, JAMES C** | Specimen #: | **S14-16100** |
| Patient ID#: | W3901564 | Collected: | 06/27/2014 |
| DOB/Sex: | 04/04/1939 M | Received: | 06/27/2014 |
| Physician(s): | | Resident: | Christopher Kim, M.D. |

Specimen(s):     A. LEFT SUPRACLAVICULAR LYMPH NODE     Other:

**CLINICAL INFORMATION:**
75 y/o male w/ hx of metastatic melanoma treated with Ipilimunab.  Please send for BRAF.  Need bx of L supraclavicular LN #4 for melanoma.  ICD-9 Code: 172.9

**FINAL DIAGNOSIS:**

LYMPH NODE, LEFT, SUPRACLAVICULAR (LYMPHADENECTOMY):
- Metastatic melanoma
- Immunostains are confirmatory

COMMENT: BRAF mutational analysis has been sent and will be reported separately in an addendum.

### GENERAL IMMUNOHISTOCHEMISTRY REPORT

BLOCK:      A1
FIXATIVE:      Formalin

| ANTIBODY/PROBE: | RESULT/COMMENT |
|---|---|
| HMB45 | positive |
| MART1 | positive |
| SOX10 | positive |
| Tyrosinase | positive |

INTERPRETATION: Consistent with metastatic melanoma

C

 **Health**

COURI, JAMES C
MRN:
Enc. Date 07/15/14

actions (continued)

Orders

Treatment condition 02 [NUR876 Custom]
Nursing communication 22 [NUR1012 Custom]
Nursing communication 24 [NUR1014 Custom]

| | |
|---|---|
| ECG 12 lead [ECG1 Custom] | 8/20/2014 |
| Transthoracic Echo Adult Complete [ECH10 Custom] | 8/7/2014 |
| NM Myocardial Rest and Stress Pharmacologic Perfusion SPECT [IMG418 Custom] | 9/17/2014 |
| NM Stress Pharmacologic [ECH5065 Custom] | 9/17/2014 |
| Spirometry [PFT2 Custom] | 10/25/2014 |
| Diffusing Capacity, Carbon Monoxide [PFT6 Custom] | 10/25/2014 |
| MRI Brain w wo Contrast [IMG271 Custom] | 7/10/2015 |

Problem List as of 7/15/2014

CAD (coronary artery disease)
Stented coronary artery
Dyslipidemia
Metastatic melanoma
COPD (chronic obstructive pulmonary disease)
Winged scapula
HTN (hypertension)
Anxiety
Lung metastasis
Metastasis to lymph nodes

Vital Signs/Measurements - Last Recorded

| 122/72 | 62 | 37.2 °C (99 °F) (Oral) | 18 | 1.854 m (6' 1") | 113.399 kg (250 lb) |

32.99 kg/m2

Couri, James C (MR...

Page

 **Health**

*UCLA* (handwritten)

COURI JAMES C.
MRN
Enc. Date 07/15/14

...cations and Orders

...rrent Medications

- spirin 81 mg EC tablet
- ...tenolol (TENORMIN) 25 mg tablet
- torvastatin (LIPITOR) 80 mg tablet
- ...zithromycin (ZITHROMAX) 250 mg tablet
- ...iprofloxacin (CIPRO) 500 mg tablet
- ...:otrimoxazole DS (BACTRIM DS) 800-160 ...ng tablet
- dexamethasone 0.1% ophthalmic solution
- dutasteride (AVODART) 0.5 mg capsule
- famotidine (PEPCID) 40 mg tablet
- fluticasone-salmeterol (ADVAIR) 250-50 mcg/dose diskus
- hydrocodone-acetaminophen (NORCO) 5-325 mg tablet
- ibuprofen (ADVIL, MOTRIN) 800 mg tablet
- metformin (GLUCOPHAGE) 500 mg tablet
- oxycodone 5 mg tablet
- ranolazine (RANEXA) 1000 mg 12 hr tablet
- tamsulosin (FLOMAX) 0.4 mg capsule
- tiotropium (SPIRIVA) 18 mcg/act inhalation capsule

Take 1 tablet (81 mg total) by mouth daily.
Take 1 tablet (25 mg total) by mouth daily
Take 1 tablet (80 mg total) by mouth daily

*Current Drugs Taken Now 7-15-14* (handwritten)

Take 1 capsule (0.5 mg total) by mouth daily

Inhale 1 puff two (2) times daily.

Take 1 tablet (500 mg total) by mouth two (2) times daily with meals.

Take 1 tablet (1,000 mg total) by mouth two (2) times daily
Take 0.4 mg by mouth at bedtime.
Place 18 mcg into inhaler and inhale daily

...Facility-Administered Medications 7/15/2014

- ipilimumab (Yervoy) 335 mg in sodium chloride 0.9% 177 mL IVPB

Inject 335 mg into the vein

...Allergies as of 7/15/2014

...mmunizations administered on date of encounter - 7/15/2014

Result Summary

Visit Disposition

Sign Up for MyChart

myUCLAhealth allows you to send messages to your care team, view your test results, renew your prescriptions, schedule appointments, and more. To sign up, log on to http://my.UCLAhealth.org. Once you are logged on, click on the Sign Up Now link and you will access the new member sign-up page. Enter your myUCLAhealth Activation Code exactly as it appears below to complete the sign-up process. If you do not sign up before the expiration date, you must request a new code

myUCLAhealth Activation Code:
**Expires: 6/27/2015  4:54 AM**

If you have questions, call our Patient Support Line at 855-364-7052. Remember, myUCLAhealth is NOT to

# IMPORTANT SAFETY INFORMATION ABOUT YERVOY (ipilimumab)

**YERVOY can cause serious side effects in many parts of your body which can lead to death. These serious side effects may include: inflammation of the intestines (colitis) that can cause tears or holes (perforation) in the intestines; inflammation of the liver (hepatitis) that can lead to liver failure; inflammation of the skin that can lead to severe skin reaction (toxic epidermal necrolysis); inflammation of the nerves that can lead to paralysis; inflammation of hormone glands (especially the pituitary, adrenal, and thyroid glands) that may affect how these glands work; and inflammation of the eyes.**

These side effects are most likely to begin during treatment; however, side effects can show up months after your last infusion. Your healthcare provider should perform blood tests, such as liver and thyroid function tests, before starting and during treatment with YERVOY. Your oncologist may decide to delay or stop YERVOY.

Call your healthcare provider if you have any signs or symptoms or they get worse. Even seemingly mild symptoms can lead to severe or even life-threatening conditions if not addressed. Do not try to treat symptoms yourself.

## SERIOUS SIDE EFFECTS MAY INCLUDE:

- **Inflammation of the intestines (colitis) that can cause tears or holes (perforation) in the intestines.** Signs and symptoms of colitis may include:
  - diarrhea (loose stools) or more bowel movements than usual
  - blood in your stools or dark, tarry, sticky stools
  - stomach pain (abdominal pain) or tenderness

- **Inflammation of the liver (hepatitis) that can lead to liver failure.** Signs and symptoms of hepatitis may include:
  - yellowing of your skin or the whites of your eyes
  - dark urine (tea colored)
  - nausea or vomiting
  - pain on the right side of your stomach
  - bleeding or bruise more easily than normal

- **Inflammation of the skin that can lead to severe skin reaction (toxic epidermal necrolysis).** Signs and symptoms of severe skin reactions may include:
  - skin rash with or without itching
  - sores in your mouth
  - your skin blisters and/or peels

- **Inflammation of the nerves that can lead to paralysis.** Symptoms of nerve problems may include:
  - unusual weakness of legs, arms, or face
  - numbness or tingling in hands or feet



Please see accompanying Full Prescribing Information, including **Boxed WARNING** regarding **immune-mediated side effects**, and Medication Guide, for YERVOY.

14

D

MICHAIL SHAFIR, M.D., F.A.C.S.

SURGICAL ONCOLOGY

CLINICAL PROFESSOR OF SURGERY
MOUNT SINAI SCHOOL OF MEDICINE
DERALD H. RUTTENBERG CANCER CENTER
1021 PARK AVENUE   NEW YORK, NY 10028

TELEPHONE: (212) 534-6900

May 23, 2006

AFFIRMATION

State of New York
County of New York

Dr. Michail Shafir a physician duly licensed in the State of New York hereby affirms upon penalty of perjury:

1. I am a Oncologic Surgeon in New York City and also at Mount Sinai Medical Center.

2. James Couri is my patient who has been diagnosed with malignant melanoma, confirmed after numerous tests located in his right arm.

3. I am also evaluating if the malignancy has spread to other of Mr. Couri's organs, bones, etc. which requires further and continuing testing, ongoing now.

4. Mr. Couri's surgery took place at Mt. Sinai Hospital on May 17, 2006 for removal of the malignant melanoma and various lymph nodes.

5. After the surgery Mr. Couri will require post operative care, convalescence, medications, care and treatment, the extent of which will be determined based upon the surgical results and his prognosis, after surgery. Mr. Couri may also require further surgery for this malignancy.

6. The aforementioned outlined prognosis and conditions of Mr. Couri are in addition to his cardiac and other medical issues. Accordingly, Mr. Couri will not be able to resume his normal activities, and work, and/or conduct trials, depositions etc. until all of the foregoing is completed, and his condition is fully and satisfactorily resolved, and it is determined that the cancer malignancy is removed operatively.

7. The forgoing evaluations etc. are based upon my medical teaching, training, and experience, and my treatment of James Couri.

Michail Shafir, M. D.

MS/sc

E



AFFIDAVIT

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

Dr. Thomas F. Reynolds being duly sworn deposes and says under penalty of perjury:

1. I am a Diplomate, American Boards of Internal Medicine and Medical Oncology.

2. I am affiliated with Cedars Sinai Medical Center in Los Angeles, California and Eisenhower Medical Center, in Rancho Mirage, California.

3. James Couri has been my patient since 2006.

4. I make this Affidavit after evaluations of Mr. Couri's: medical condition, physical examinations and consultations with Mr. Couri, and my review of Mr. Couri's recent medical, surgical and radiology records from UCLA Medical Center and other medical institutions; particularly, relative to Mr. Couri's Stage IV cancer, cardiac condition; and current gastro intestinal disorders.

STAGE IV CANCER & IPILIMUMAB TREATMENT PROTOCOL

5. Mr. Couri was diagnosed with Level V, Stage III Melanoma Cancer in 2006 and confirmed lympovascular invasion. He underwent surgery at that time for the removal of the malignancy and approximately 17 lymph glands, some also with invasion of malignancy.

6. Thereafter, Mr. Couri has been actively monitored by me and Specialists affiliated with UCLA Medical Center in Los Angeles, CA, and other medical institutions.

7. On or about October 15, 2009, Mr. Couri was diagnosed with a recurrence of melanoma cancer, Stage IV, in his lung area and elsewhere. Mr. Couri also recently learned of his exposure to asbestos. This is medically significant in view of his fragile immune system, his illness, and ongoing treatments and immuno therapy.

8. Mr. Couri, in October 2009, underwent two surgeries at UCLA Medical Center. On December 15, 2009 at UCLA, Mr. Couri underwent major thorasic surgery for the attempted removal of the newly detected cancer sites.

9. Based upon subsequent PET-CT Scans and post-operative and pathology reports, etc., it was confirmed that Mr. Couri's cancer disease had not been fully removed. In fact, the PET/CT Scans of Mar. 21, 2010 and of Feb. 22, 2010 taken at UCLA revealed that the findings were consistent with active and progressive metastatic disease.

10. In 2010 Mr. Couri began undergoing in hospital medical and immuno therapy. In March, 2010, due to the gravity of Mr. Couri's condition, and his unresectable Stage IV cancer, UCLA Specialists proposed to Mr. Couri that he be considered for a 'Compassionate Use Research Program' Melanoma Cancer Protocol-CA 184-045, IPILIMUMAB, sponsored by Bristol-Meyers-Squibb, (BMY). This Investigational Drug Protocol was offered to Mr. Couri, by invitation, because he suffers from cancer that spread throughout his body.

11. In April 2010, Mr. Couri entered into a Consent to participate in this highly significant Protocol at UCLA. This Ipilimumab Protocol began on April 21, 2010 and spans an initial 4 Phases (12 Weeks), which includes frequent 90 minute in-Hospital Infusions of Ipilimumab. Thereafter the Protocol and Infusions continue in consecutive cycles of 12 weeks each, and continues thereafter in the same incremental cycles based upon Mr. Couri's condition and the determinations of the Specialists at UCLA, BMY, my office and others involved in this highly important cancer treatment. During this entire Protocol, Mr. Couri must undergo in-UCLA: Pt/Ct Scans, Vital Sign Management, Blood-Draws and numerous physical examinations by various Specialists at UCLA. If any adverse effects appear, Mr. Couri will be immediately hospitalized at UCLA.

12. This Drug Protocol also comes with very significant side effects and risks of which many can be life threatening. The Ipilimumab Drug was then not yet approved by the United States Food and Drug Administration (FDA). It was approved in February 2011.

13. Mr. Couri is also being prescribed potent medications for pain management. Mr. Couri is accordingly being carefully monitored and supervised daily, both in and out of UCLA Medical Center in Los Angeles California. Mr. Couri's condition is extremely serious and is now further complicated by the recent revelation that he is being evaluated for cardiac and intestinal surgeries.


## SEVERE CORONARY ARTERY DISEASE & PENDING OPEN HEART SURGERY

14. Mr. Couri continues to suffer from extensive and progressive coronary artery disease and chronic angina. He has undergone six angioplasty procedures to re-canalize some of his occluded arteries, which included the placement of eight stents implants and two unsuccessful attempts to re-canalize his occluded left anterior descending artery.

15. Mr. Couri is required to take multiple mood altering medications and is currently mandated to undergo testing for his cardiac disease, which is monitored by me, and Specialists at UCLA Medical Center, who are also involved in the Ipulimumab Protocol and the constant and complex care of Mr. Couri.

16. Mr. Couri has recently been diagnosed with a recurrence of persistent and severe congestive heart disease. Accordingly Mr. Couri is now undergoing testing and evaluations for his submitting to cardiac surgery in order to recanalize his totally blocked left descending artery and replacement of any impacted and blocked stents. This circumstance will mandate Mr. Couri to first undergo invasive in hospital Angiograms, and significant other testings before heart surgery, which will be conducted on Mr. Couri at UCLA Medical Center. Due to this chronic

angina, it is difficult for Mr. Couri to walk any significant length without experiencing severe angina, discomfort and pain.

## CHRONIC GASTRO-INTESTINAL DISORDERS AND PENDING SURGERY

17. Additionally, Mr. Couri suffers from persistent bowl, digestive and gastro intestinal disorders and obstructions. He was hospitalized for pancreatitis under my care. This condition is further complicated by the infusions of Ipilimumab and his recent finding that he has been unknowingly exposed to asbestos, bacteria, fungus and mold. In fact Mr. Couri has recently experienced intestinal pain, infections and disorders for which he is being medicated. Mr. Couri has been prescribed intestinal antibiotics and other medications in an attempt to control this condition. He is currently undergoing further exploratory, upper GI and other in hospital intestinal testing as well. Mr Couri was admitted on an emergency basis to the UCLA Hospital on August 19, 2011 due to a severe intestinal pain and obstruction, and is presently being treated for this condition. After consultations with surgeons, Mr. Couri is now being evaluated for intestinal surgery in order to resect and remove these intestinal obstructions and constrictions, etc. This proposed surgery is extremely risky and complex due in part to Mr. Couri's health, age and medical situation.

18. Mr. Couri underwent a transhiatal-esophagectomy for dysplasia in 1994 (removal of his esophagus). Mr. Couri therefore continues to suffer from digestive and gastro-intestinal complications for which he is prescribed numerous medications. As a consequence, Mr. Couri is mandated to undergo periodic endoscopic procedures and biopsies to monitor his esophageal condition for cancer and other complications, some of which have again spawned mandating surgery assessment of Mr. Couri's circumstances.

## ASBESTOS AND MOLD EXPOSURE

19. Mr. Couri's recently reported approximate two-year exposure to friable asbestos and airborne mold has significant consequences and complications to Mr. Couri's health care, particularly in light of his fragile immune system and health issues. Based upon my medical teaching and training as an oncologist and medical doctor, at the very least, Mr. Couri will now be required to undergo more frequent pet/CT, CT scans, x-rays, blood tests, and other tests for many years, in the hope of detecting any physicological changes in his lungs and elsewhere due to his exposure to friable asbestos.

20. Mr. Couri's exposure to mold also has significant consequences to his health care also in light of his fragile immune system. Mr. Couri has recently been diagnosed with Filamentary Keratitis by Dr. Greg Evans. Mr. Couri is relegated to a regime of antibiotic and other eye medications, including Tobramycin/Dexamethasone and Vigamox, to attempt to control this resilient eye infection.

21. Mr. Couri's recent diagnosis of a gastro-intestinal bacterial infection requires treatment with a Metronidazole and Xifaxan regimen. This current infection may have been

exacerbated by exposure to mold, fungus and bacteria. Mr. Couri is currently being tested for a recently discovered urological infection as well.

## SPINAL AND SKELETAL DISORDERS & RECENT HIP REPLACEMENT SURGERY

22. Mr. Couri continues to suffer from chronic and severe back pain, spinal inflammation and degenerative spinal disc and shoulder disease. Mr. Couri undergoes therapy and treatment, along with medical intervention to stabilize the pain Mr. Couri experiences related to these conditions. Mr. Couri has also been diagnosed with ankylosing spondylitis.

23. Mr. Couri underwent major surgery of a full hip replacement on March 11, 2011 at UCLA Medical Center.  He is in physical therapy at Eisenhower Medical Center and at UCLA in California.

## MR. COURI'S INABILITY TO TRAVEL OR ENGAGE IN STRESSFUL ACTIVITIES

24. Accordingly, in view of Mr. Couri's numerous, diverse and serious medical disorders, recent surgery, ongoing in hospital cancer treatments, required scans and other immuno-therapy protocols; as well as current evaluations for impending heart surgery, and intestinal surgery, Mr. Couri is mandated to remain in close proximity to my medical office and to the numerous Specialists at UCLA Medical Center in California involved in his medical care. Accordingly, because of the foregoing outlined treatments, impending surgeries, and the complexity and severity of Mr. Couri's medical conditions, (further complicated by his severe and debilitating heart condition), Mr. Couri is physically and mentally fragile, and cannot travel or resume conventional daily activities of any kind, under any circumstances.

25. Mr. Couri's cancer condition, the recurrence of his persistent angina, and his presently being actively tested and evaluated for additional surgeries which are further complicated by eight stents, and the highly toxic Ipilimumab Cancer Protocol he is involved, Mr. Couri requires in hospital and otherwise constant medical attention and supervision. Therefore, the foregoing circumstances mandates ongoing medical supervision and medical testing that Mr. Couri must partake in.  Most significantly, Mr. Couri is not physically able and cannot engage in any stressful activities whatsoever which will be life threatening. Any interruption of Mr. Couri's medical protocols will cause Mr. Couri severe injury. Such interferences would exacerbate his already extremely precarious condition and adversely impact his treatment and care. The current disclosure as to Mr. Couri's deteriorating heart condition, persistent angina and recurrence of gastro-intestinal blockages has caused additional negative ramifications to Mr. Couri's fragile health.

26. Accordingly, Mr. Couri's active cancer and other healthcare and treatments, and impending cardiac and intestinal surgeries, mandate that he cannot travel under any circumstances. Mr. Couri must remain in daily physical contact and in close proximity to his healthcare providers and to UCLA Medical Center, in California where his ongoing treatments and testing has and are being conducted. Furthermore, in light of all of the forgoing, Mr. Couri cannot partake in any form of stressful or adverse activities whatsoever. Such circumstances will confront Mr. Couri to extreme risks to his life. If  Mr. Couri is confronted with adverse, hostile

or stress of any kind, same will have grave consequences to him, to his fragile health, and will be life threatening to Mr. Couri.

27. The foregoing is based upon my teaching, training, and experience, and the care of Mr. James Couri.

Thomas F. Reynolds MD FACP

Sworn to before me this 23rd
Day of August 2011.

Notary Public

CECILIA M. DIAZ
Commission # 1884427
Notary Public - California
Riverside County
My Comm. Expires Mar 28, 2014

F

May-14-2012 09:53 AM US Bank 4178878506

05/12/2012  10:15    2100000000                        2A                              PAGE  02/04

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lydia Alexandra Couri,
                    Plaintiff,

        - against -

McLaughlin Stern LLP,
Jon Paul Robbins Esq. et al,
                    Defendants.

CASE 12-CV-2220

AFFIDAVIT OF A. CARLA NATIONS
NATURAL MOTHER OF LYDIA
ALEXANDRA COURI

---

STATE OF MISSOURI
COUNTY OF GREENE

A. CARLA NATIONS being duly sworn deposes and says:

1. I am the natural mother of Lydia Alexandra Couri (Alex).

2. I am a recovering substance abuser having gone into rehabilitation thanks to my former husband James Couri's (James) persistence and tenacity, which resulted in an Intervention in 1982 and subsequent treatment at Smithers Institute in New York City and other facilities resulting in my sobriety for more than 17 years.

3. I consented to James Sole Custody of Alex in 1986 and concentrated for about 7 years on my recovery.

4. I reside in Springfield Missouri having remarried and now separated.

5. I resumed contact with Alex in or about 1996.

6. I have functioned as a substance abuse counselor, including at Care Unit Hospital, Fort Worth, Texas and am fully familiar with Alex and her activities since 1996.

7. I regret this Affidavit, but I am desperately attempting to cause Alex to obtain treatment for her addictions and mental disorders at a qualified treatment facility such as Hazelton, Betty Ford, or The Meadows.

8. Accordingly, I set forth some of my experiences with Alex (from 1996 through 2011) that confirm her substance abuses and addictions.

May-14-2012 09:53 AM US Bank 4178878506

05/12/2012  10:15    2100000000                2A                                PAGE  03/04

9.  While Alex was visiting me in Missouri, an argument ensued which resulted in Alex physically attacking me at my home in my bedroom.  This conduct spawned by Alex's substance abuse.

10.  Thereafter, in my desire to try to continue to maintain and develop a closeness to Alex, I traveled from Missouri to California to visit with her.  On the last two occasions, Alex became abusive, nasty, demanding, and argumentative sufficiently to a point that the situation became unbearable and frightening to me.  As a result, I was forced to promptly depart and return to Missouri.

11.  Further, Alex engaged in very inappropriate and sexual conduct with my now estranged husband Dan behind my back.

12.  On one occasion, when Alex was visiting me on a Christmas holiday while I was separated from my husband Dan, Alex went to a bar and picked up and brought to my home a total stranger in the middle of the night while Alex was intoxicated apparently seeking a sexual encounter.  I demanded the man leave.  At that time, I begged Alex to seek substance abuse treatment.  She refused.

13.  Alex also again admitted to substance abuse to me, relating an incident while Alex was under the influence in the Ivy Restaurant in Los Angeles in the presence of her then boyfriend David DeSanctis and his parents.

14.  In Aspen Colorado where I had paid for Alex's airfare and hotel, Alex became intoxicated and ordered a $400 steak in the presence of others forcing me into a corner of not being able to reject her selection.  I paid the tab.

15.  As recently as July 2011, I had just arrived for what was planned as a four-day visit with Alex in Los Angeles.  Soon, after my arrival, Alex became more than abusive, acting irrational, glassy eyed and hyper (telltale signs of drug abuse).  This incident was at the home of David R. Fisher Esq.  Alex began out of the blue, a diatribe verbally attacking and accosting me in such a manner that I became terrified and alarmed.  As Alex continued and her rant escalated I became shaken and scared.  I decided for my safety and based on her behavior and threatening utterances, it was best that I promptly depart for a hotel.  Thereafter, I secured a taxi, went to the Sunset Tower Hotel and left the next morning for my home in Missouri.  Since that time, I have not seen or spoken to Alex.

16.  Some time ago, I personally secured a $500,000.00 life insurance policy on my life with Alex as beneficiary; done so out of my love for my daughter.  As a result of Alex's continued pattern of horrible activities, substance addictions, and her unwillingness to allow us to aid her to seek help, I decided to terminate this insurance policy, which I recently have done.

17. I also wish to disclose that after agreement with Alex's Father James, I paid approximately $160,000 towards Alex's tuition at Washington University (1997 - 2001).  I also, along with James, expended for Alex's lodging and other college expenses.  Furthermore, I spent and paid to and for Alex additional sums for her expenses and lifestyle, clothing, and other tangibles from time to time during the periods 1996 to 2011.

18. There is no question, based on my training and first hand knowledge of substance abuse and addictions, my observation and interaction with Alex reveal that she regretfully inherited my genetic makeup.  Alex is sadly addicted to substances and alcohol.  I have observed Alex while she was under the influence of drugs and/or alcohol, conduct that I am regretfully fully familiar with.  Alex's behavior (under the influence) is not dissimilar to mine while I was an addict.  Alex, as I could during my addictions, is able abstain for brief periods and falsely appear normal.  Please do not be fooled: she is not.

19. I make this Affidavit with a heavy heart and love for my only daughter Alex.  I hope and pray that this Court will take steps to seek Alex's evaluation and prescription records, as without that and prompt treatment in an accredited facility, I fear for Alex's wellbeing and life.



A. Carla Nations

Sworn to before me this 14th
day of May 2012.

Notary Public

CYNTHIA M. CREWS
Notary Public
Greene County
My Commission Expires
Jan. 15, 2015
Commission #1056182

cc: All Parties

G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE: 12-CV- 2220

Lydia Alexandra Couri,
               Plaintiff,

AFFIDAVIT OF MARLENE COURI

     - against -

McLaughlin Stern LLP,
Jon Paul Robbins Esq. et al,
               Defendants.

_____

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

MARLENE COURI being duly sworn deposes and says:

1. I am the wife of James Couri (James), married March 5, 1988.

2. At the time of our marriage James had obtained (in 1986) Sole and Separate Custody of his daughter Lydia Alexandra Couri (Alex) by Court Order in the Unified Court, White Plains, New York (Judge Sandra Miller).  Alex was 8 years old and lived with James.

3. At the time, Alex's natural mother, Carla, had no contact with her daughter and had in fact disappeared for about the first 7 years of our marriage, due to her substance addictions and inability to care for Alex.

4. After our marriage, although I did not adopt her legally, I virtually became Alex's mother, which is what she wanted to call me and I gladly accepted.  I was determined to help her since I could see she was an emotionally unstable child.  Alex was a very clingy, needy child, who often threw tantrums and was extremely demanding and bossy.  I took this responsibility seriously as I had just raised two of my biological daughters on my own who were adults.  I thought with time and lots of love she would settle down and become stable.

5. During the first weeks of living with Alex, she boasted to me that she knew how to get whatever she wanted from her father James by throwing a fit or making him feel guilty.  I prayed this was not a sign of her underlying personality.  I noticed the leather front cover of Alex's baby book that Carla had filed out was boldly printed in Alex's earliest handwriting stating "I Love Me - Alex" in ink.  I also read a Court document from the Custody proceedings, where the Court ordered Psychiatrist "Dr. Bloomingdale" Evaluation of Alex.  The Report stated that Alex was "self-centered" and predicted that Alex would grow up to be a "manipulator and game player".

6. I find it unfortunate to lay out in this Affidavit some of Alex's background of her difficult and unstable behavior. I'm still hoping to help her now, as always, realizing the troubled adult she has grown into.

7. We molded our lives around Alex. She attended Greenwich Academy in Greenwich Ct., and we resided, for the benefit of Alex's schooling (a day student), in Rye New York and commuted to New York City during weekdays driving back and forth for James business activities. During our marriage, we never carried on a "New York social life". Our life was centered around Alex.

8. I became a full time mother to Alex having stopped working when I married James and sold my business in or about 1988, a prominent modeling agency and school for a substantial sum of money. I am now a proficient artist (website: marlenecarrollcouri.com).
I advanced and paid for many of Alex's expenses out of my own funds, including various payments for Greenwich Academy, Miss Porters School, Buck's Rock Camp, Sorbonne in Paris and many of Alex's personal expenses, until as recently as 2011; although under no obligation to do so. I have never at any time used any funds from the LAC i989 Trust (Trust) for my personal benefit. My dear father never needed or received any financial support from me or James, and surely not from the Trust. Any "furs or jewelry" I paid for with my own money. I attended Alex's numerous school activities, including Mother's Day. I took her to ballet and art classes, orthodontic and pediatric doctors appointments, as well as driving her to school (one-hour round trip) when she frequently missed the school bus. These activities and services paid for by me and James.

9. During her school years at Greenwich Academy, a large group of classmates would no longer have anything to do with Alex because of her demanding, difficult behavior and she had to make other friends. Alex always was scholastically very bright, but emotionally difficult and unstable to friends and family.

10. Alex attended Miss Porters as a boarding student from her freshman through senior year, again paid for by me and James. James and I visited Alex almost every weekend (4 hours round trip). There came a time that the Head Mistress at Miss Porters was ready to expel Alex when Alex was found on campus using marijuana with other students, including Sarah Ball (who Alex is still associated with). Her father James intervened and convinced the school to only suspend Alex for ten days and placed her on school probation.

11. Upon visiting Alex's dormitory at Porters we would discover that Alex took items from our home without ever asking. Alex has always had an irrational sense of entitlement. Through her adult years as well, we have discovered that items were missing from our home after Alex visited, including narcotic drugs prescribed for James, post many surgeries.

12. Alex tearfully revealed to me that she had a sexual relationship with her mother Carla's husband years after the events. Alex explained that Carla was hospitalized and was on "suicide watch" upon learning of this betrayal.

13. Alex also confided that she had an inappropriate sexual relationship with her married employer, Michael Kohn; as well as difficulties with other staff members and was placed on "warning".

14. Alex has had a history of computer hacking, including the recent bogus email presented by Max Folkenflik to this Court. Then there is the incident with Alex's ex-boyfriend (David DeSanctis) that Alex's father James intervened again as her Attorney in Fact to quash a potential lawsuit for computer and email invasion; DeSanctis was represented by lawyer David R. Fisher Esq., who is now a part of this insane Courthouse charade. Additionally, Alex bragged to me that DeSanctis didn't realize that she was using DeSanctis's credit to continue ordering for herself home delivered diet meals from an expensive diet program.

15. In about 2009, while Alex was unemployed, Alex came to her father and I and confessed that she signed a contract at Sonya Dakar Skin Salon for about $2,500.00 worth of skin treatments that she had no means of paying. Again, as her Attorney in Fact, Alex asked her Dad to intervene for her and somehow cancel this compulsive decision and thoughtlessly signed document. James again swooped in and aided his daughter. Just as James also did the following year when Alex's landlord was unfairly keeping her security deposit when she vacated her apartment; Attorney-in-Fact-Dad came to her rescue.

16. Upon a visit to Alex's apartment a couple of years ago, I notice a green moss-like clump laying on her table and she quickly picked it up, implying that a friend of her must have left it behind. She admitted it was marijuana. A family member has revealed to me that Alex uses medical marijuana and has observed her doing so. We were told Alex has a bogus prescription for marijuana. Alex has talked about her use of xanax, Zoloft, Adderall, and she has taken from our home painkillers such as oxycodone, vicadin, and other narcotics; which is not normal. Alex has needed a registered Emotional Support Dog for traveling on airlines, which requires psychiatrist verification in writing revealing the patient has a mental illness.

17. Alex also received emails from the new girlfriend of another Alex ex-boyfriend (Ian Midgley) warning Alex to stop her bizarre and unwanted phone calls, emails and stalking of Ian. Alex had an extremely difficult time letting go of Ian. Most all of Alex's boyfriends have been the one to end the relationships with her.

18. Alex confided in me that she had fraudulently filled Unemployment records so she could receive more unemployment funds than she legally had a right to. Alex has been fired and rehired again and again by Kim Light and Tim Fleming, both of whom I have been told by Alex are substance abusers.

19. Late summer 2011, Alex appeared at our home looking like she had not bathed, was very disheveled, glassy eyed and acting erratic. She was clearly on some form of drugs and was screaming and hysterically threatening, using her auto to threaten running over her father.

20.   Alex's adult life and activities seem to reveal that her unstable childhood behavior and substance abuse has blossomed into a very troubled and addicted adult.  Sad as it is to point out to this Court what I've observed and/or been told by Alex, it is necessary to get her some professional help in a competent facility for addiction.  Until last year when Alex turned on her own family, I had a close relationship with her, with often daily contact, by phone, email and in person.

21.   Over the years, I have not only been a loving mother to Alex, I have financially advanced a substantial sum of money to support and help her.  The November 2010 Agreement was not solicited by me.  The terms of that Agreement were willingly agreed to by Alex in my presence and negotiated by her father on my behalf.  I appreciated the gesture and was pleased to see that Alex knew it was the right thing to do since she owed me a large sum representing loans and advances to and for her, much during her adult years.  Thereafter, during 2011, Alex, as part of her obligations, entered into and signed other commitments, etc.

22.   Additionally, I wish to confirm to the Court that I am James Couri's "Sole Caregiver".  He is very ill and suffers from multiple disorders, as confirmed by Dr. Reynolds Affidavit.  Among many other duties, I take James by car to UCLA, a over 2 hour drive from our home in the Coachella Valley, sometimes daily, for medical care and treatment.  Accordingly, neither James nor I can travel.

Marlene Couri

State of California
County of RIVERSIDE
Subscribed and sworn to (or affirmed)
before me on this 11ᵗʰ day of MAY
20 12 by MARLENE COURI
proved to me on the basis of satisfactory
evidence to be the person(s) who
appeared before me.

Signature

Sworn to before me this _____
day of May 2012.

_____
Notary Public

NAYAN P. GHELANI
Commission # 1825490
Notary Public - California
Riverside County
My Comm. Expires Dec 31, 2012

cc: All Parties

H

# DURABLE GENERAL POWER OF ATTORNEY
## NEW YORK STATUTORY SHORT FORM

*THE POWERS YOU GRANT BELOW CONTINUE TO BE EFFECTIVE*
*SHOULD YOU BECOME DISABLED OR INCOMPETENT*

**Caution:** This is an important document. It gives the person whom you designate (your "Agent") broad powers to handle your property during your lifetime, which may include powers to mortgage, sell, or otherwise dispose of any real or personal property without advance notice to you or approval by you. These powers will continue to exist even after you become disabled or incompetent. These powers are explained more fully in New York General Obligations Law, Article 5, Title 15, Sections 5-1502A through 5-1503, which expressly permit the use of any other or different form of power of attorney.

This document does not authorize anyone to make medical or other health care decisions. You may execute a health care proxy to do this.

If there is anything about this form that you do not understand, you should ask a lawyer to explain it to you.

THIS is intended to constitute a DURABLE GENERAL POWER OF ATTORNEY pursuant to Article 5, Title 15 of the New York General Obligations Law:

I, Lydia Alexandra Couri, 575 Madison Avenue, New York, New York 10022 do hereby appoint:

*(insert your name and address)*

James C. Couri, 575 Madison Avenue, New York, New York 10022

*(If 1 person is to be appointed agent, insert the name and address of your agent above)*

XXXXXXXXXXXXXXXXXXXXXX

*(If 2 or more persons are to be appointed agents by you insert their names and addresses above)*

my attorney(s)-in-fact TO ACT
*(If more than one agent is designated, CHOOSE ONE of the following two choices by putting your initials in ONE of the blank spaces to the left of your choice:)*

[       ] Each agent may SEPARATELY act.
[       ] All agents must act TOGETHER.
*(If neither blank space is initialed, the agents will be required to act TOGETHER)*

IN MY NAME, PLACE AND STEAD in any way which I myself could do, if I were personally present, with respect to the following matters as each of them is defined in Title 15 of Article 5 of the New York General Obligations Law to the extent that I am permitted by law to act through an agent:

**(DIRECTIONS:** Initial in the blank space to the left of your choice any one or more of the following lettered subdivisions as to which you WANT to give your agent authority. If the blank space to the left of any particular lettered subdivision is NOT initialed, NO AUTHORITY WILL BE GRANTED for matters that are included in that subdivision. Alternatively, the letter corresponding to each power you wish to grant may be written or typed on the blank line in subdivision "(Q)", and you may then put your initials in the blank space to the left of subdivision "(Q)" in order to grant each of the powers so indicated.)

| | |
|---|---|
| [ *LAC* ] (A) real estate transactions; | [ *LAC* ] (M) making gifts to my spouse, children and more remote descendants, and parents, not to exceed in the aggregate $10,000 to each of such persons in any year; |
| [ *LAC* ] (B) chattel and goods transactions; | |
| [ *UML* ] (C) bond, share and commodity transactions; | [ *LAC* ] (N) tax matters; |
| [ *LAC* ] (D) banking transactions; | [ *LAC* ] (O) all other matters |
| [ *LAC* ] (E) business operating transactions; | [ *LAC* ] (P) full and unqualified authority to my attorney(s)-in-fact to delegate any or all of the foregoing powers to any person or persons whom my attorney(s)-in-fact shall select; |
| [ *LAC* ] (F) insurance transactions; | |
| [ *LAC* ] (G) estate transactions; | |
| [ *LAC* ] (H) claims and litigation; | |
| [ *LAC* ] (I) personal relationships and affairs; | |
| [ *LAC* ] (J) benefits from military service; | [ *LAC* ] (Q) each of the above matters identified by the following letters: A,B,C,E,F, G,H,I,J,K,L,M,N,O,P,Q——— |
| [ *LAC* ] (K) records, reports and statements; | |
| [ *LAC* ] (L) retirement benefit transactions; | |

*(Special provisions and limitations may be included in the statutory short form durable power of attorney only if they conform to the requirements of section 5-1503 of the New York General Obligations Law.)*

This Durable Power of Attorney shall not be affected by my subsequent disability or incompetence.

If every agent named above is unable or unwilling to serve, I appoint *(insert name and address of successor)*

MARLENE COURI, 575 Madison Avenue, New York, New York
to be my agent for all purposes hereunder.

**To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy or facsimile of this instrument may act hereunder, and that revocation or termination hereof shall be ineffective as to such third party unless and until actual notice or knowledge of such revocation or termination shall have been received by such third party, and I for myself and for my heirs, executors, legal representatives and assigns, hereby agree to indemnify and hold harmless any such third party from and against any and all claims that may arise against such third party by reason of such third party having relied on the provisions of this instrument.**

**This Durable General Power of Attorney may be revoked by me at any time.**

**In Witness Whereof,** I have hereunto signed my name this   23   day of   December 1999

(YOU SIGN HERE:) ➡️ *(Signature of Principal)*
LYDIA ALEXANDRA COURI

ACKNOWLEDGMENT IN NEW YORK STATE (RPL 309-a)     ACKNOWLEDGMENT OUTSIDE NEW YORK STATE (RPL 309-b)

State of New York                    State of
County of New York                   County of

On Dec 23, 1999   before me, the undersigned,   On   before me, the undersigned,
personally appeared                  personally appeared
   LYDIA ALEXANDRA COURI
personally known to me or proved to me on the basis of satisfac-   personally known to me or proved to me on the basis of satis-
tory evidence to be the individual(s) whose name(s) is (are) sub-   factory evidence to be the individual(s) whose name(s) is (are)
scribed to the within instrument and acknowledged to me that   subscribed to the within instrument and acknowledged to me
he/she/they executed the same in his/her/their capacity(ies), and   that he/she/they executed the same in his/her/their capacity(ies),
that by his/her/their signature(s) on the instrument, the individ-   and that by his/her/their signature(s) on the instrument, the indi-
ual(s), or the person upon behalf of which the individual(s) acted,   vidual(s), or the person upon behalf of which the individual(s)
executed the instrument.   acted, executed the instrument, and that such individual made
   such appearance before the undersigned in

*(signature and office of individual taking acknowledgment)*   *(insert city or political subdivision and state or county or other place acknowl-
   edgment taken)*

Gloria A. Rodriguez
Notary Public, State of New York
No. 01RO5042511
Commission Expires August 23, 2001   *(signature and office of individual taking acknowledgment)*

*Publisher's Note: This document is printed on 50% cotton paper. Unlike ordinary photocopy paper, this stock resists turning brittle and brown with age. Insist on genuine Blumberg forms to ensure the longevity of this important document.*

*The publisher maintains property rights in the layout, graphic design and typestyle of this form as well as in the company's trademarked logo and name. Reproduction of blank copies of this form without the publisher's permission is prohibited. Such unauthorized use may constitute a violation of law or of professional ethics rules. However, once a form has been filled in, photocopying is permitted.*

LYDIA ALEXANDRA COURI

TO

JAMES C. COURI

DURABLE
Power of Attorney
Statutory Short Form

Dated   December 23, 1999

I

OF AGENT(S): LYDIA ALEXANDRA COURI
_____
(PRINCIPAL)

James C Couri
_____
(AGENT)

below, to be my agent to do the things listed below for me. I also authorize to sign any
. The Chase Manhattan Bank (the "Bank") concerning the acts and things listed below.

ENT(S):

1.    TO OPEN, maintain and to reconcile bank accounts (including retirement benefit
my name or otherwise with the Bank.

2.    TO DEPOSIT with the Bank for my account or otherwise, money, checks, drafts,
s and other instruments or orders for the payment of money; also, to endorse and deliver,
ection, or otherwise, any such instruments or orders; to accept statements from the Bank,
s of demands to honor or pay instruments, notices of refusal to honor or pay, and notarized
uch refusal. The Bank may accept documents from anyone for any of the purposes listed in
whether or not these documents are endorsed. The Bank may accept endorsed documents,
hom endorsed and whether they are endorsed by rubber stamp impression or otherwise.

3.    TO SIGN and deliver checks, drafts, promissory notes and other instruments or orders
: of money at or by the Bank, and to give other orders to the Bank for the disposition of money.
honor all such orders even if they would cause an overdraft, and even if they benefit the agent.
o duty to concern itself with the disposition of any money paid at my agent's request.

4.    TO PROMISE to honor (accept) drafts, bills of exchange or other orders for the pay-
y drawn on me or the agent, made payable at the Bank or directing payment by the Bank.

5.    TO SELL to the Bank commercial paper, bills or accounts receivable, promissory notes,
instruments or orders for the payment of money. To endorse and deliver them.

6.    TO BORROW money and renew loans from the Bank, with or without security.

7.    TO PURCHASE or acquire an interest in property from or through the Bank.

8.    TO DELIVER my property or any interest in it to the Bank for safekeeping or other rea-
pledge and mortgage it to secure my present or future debts to the Bank. To give the Bank
the handling of any of my property.

9.    TO DEMAND, receive and dispose of any of my property held by or under the control
To give orders concerning the disposition of any such property.

10.  TO APPLY for letters of credit and other forms of credit and to direct the Bank to


11.  TO SIGN and deliver receipts to the Bank.

12.


13.  TO DO anything and sign anything the agent believes appropriate in furtherance of
and powers given him in this Power of Attorney. If a lawsuit arises out of any of the matters
· of Attorney in which the Bank and I are on opposite sides, both the Bank and I waive a trial
waive my right to bring any claim I may have against the Bank into a lawsuit between us.

**TION OF AGENT(S)' ACTIONS:**

I approve and confirm everything the agent or anyone he designates shall do under this
money.

**UPON POWER OF ATTORNEY:**

The Bank may rely on this Power of Attorney until it receives written notice of its termina-
, death. The Bank will incur no liability to me, my heirs or legal representatives by relying on it
ority of the agent(s). I agree for myself and for my heirs and legal representatives to protect
— any claim and to reimburse the Bank for any loss it may suffer by relying upon this Power of
upon the authority of the agent(s), or on the authority of anyone the agent(s) designates, before
es notice of termination of the Power of Attorney or of my death. I have made arrangements
to be notified promptly when I die.

The handwriting and form of signature to be used by each of the agent(s) are as

_Lydia Alexandra Cален_ _____

_____ By: _____
(AGENT)                          (AGENT)

**ACTIONS BY TWO OR MORE AGENTS:**

If I have appointed two or more agents, they may act as follows:

(a) Each may act alone.

(b) Any _____ or more may act together.

c) _____

**BANK'S RIGHT TO REQUIRE PRINCIPAL'S CONFIRMATION:**

The Bank may at any time require written confirmation by me of any orders or actions of the agent or of any one he designates to act for him before it relies upon or takes any action upon the agent's or his designee's orders or actions. The Bank shall, however, have no duty at any time or in any circumstances to ask me for a written confirmation.

**SURVIVAL OF POWER OF ATTORNEY:**

This Power of Attorney will survive any other power or authority I shall give to the agents or any of them, except to the extent that I expressly restrict or revoke any of the powers or authorities I grant. This Power of Attorney shall not be affected in the event that I become disabled or incompetent.

_____
(SIGNATURE OF PRINCIPAL)

STATE OF New York )
                        ) ss.:
COUNTY OF New York )

On this 23 day of Dec , 19 99 before me personally came _Lydia Alexandra Cален_ to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he/she executed the same.

_Gloria A. Rodriguez_

Gloria A. Rodriguez
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 28

**RATIFICATION BY AGENT(S):**

I am the agent named in this Power of Attorney. In order to induce the Bank to act in reliance upon this Power of Attorney, I agree to make good any loss the Bank or anyone who takes my place may suffer, or liability it or anyone who takes its place may incur, by honoring or paying any instruments signed or endorsed by me or the Principal or for any acts done by me. This includes acts done both before and after the Bank has received notice of the death of the Principal or of the revocation or termination of this Power of Attorney. If the Bank and I become involved in a lawsuit arising out of this Power of Attorney or my actions under it, we both waive a trial by jury. I also waive my right to bring any claim I may have against the Bank into a lawsuit between us.

_____
(SIGNATURE OF AGENT)

_____
(SIGNATURE OF AGENT)

STATE OF New York )
                        ) ss.:
COUNTY OF New York )

On this 23 day of Dec , 19 99 before me personally came _Steven Cален_ to me known and known to me to be the individual(s) described in and who executed the foregoing instrument and acknowledged to me that he/she/they executed the same.

_Gloria A. Rodriguez_

Gloria A. Rodriguez
Notary Public, State of New York
No. 01RO5048511
Commission Expires August 28

J

At a Term of the Family Court of
the State of New York, held in
and for the County of Westchester
at the Courthouse thereof, 111
Grove Street, White Plains, New
York, on the *2 5* day of August,
1986.

P R E S E N T :

        Hon. Sondra Miller,
                Judge.

-------------------------------x

In the Matter of a Proceeding  :   Docket Nos. V-686-86
Under Article 6 of the Family  :           O-867-86
Court Act.                   :
                           :
CARLA COURI,              :
                           :
       Petitioner/Respondent, :     PERMANENT
                           :  ORDER OF CUSTODY
        -against-          :
                           :
JAMES COURI,             :
                           :
       Respondent/Petitioner. :
-------------------------------x

      The instant matter having come on before this Court
(Miller, J.) by Order to Show Cause, Petition for Custody,
Cross-Petition for Custody and Petition for an Order of Pro-
tection on         , 1986; and Carla Couri having appeared
personally and by her attorney, Barry Goldstein, and James Couri
having appeared personally and by his attorney, Peter Alkalay,

and Alexandra Couri having appeared by her attorney, Lucille Oppenheim; and all parties having consented thereto;

NOW, THEREFORE, it is hereby

ORDERED, ADJUDGED and DECREED that the father, James Couri, shall have custody of Alexandra Couri; and it is further

ORDERED, ADJUDGED and DECREED that the mother, Carla Couri, shall have the right to visit with Alexandra Couri one weekend per month, commencing at 10:00 AM on Saturday and terminating at 7:30 PM on Sunday (hereinafter the "weekend visitation"), with the following provisions:

(i) such visitation may take place at a hotel within New York or Westchester County selected by Carla Couri, subject to the approval of James Couri, which approval shall not be unreasonably withheld;

(ii) in the event the weekend visitation takes place at a hotel, James Couri shall be responsible for the cost of a single room with double occupancy, as well as

-2-

K



*Republican* *Senatorial*

*Medal of Freedom*

*Chairman*
Bill Frist, M.D.

*Circle Chairman*
Sam Brownback

*Medal of Freedom Recipients*
Ronald Reagan
Margaret Thatcher
H. Norman Schwarzkopf

March 13, 2002

Mr. James C. Couri
Fl. 10
575 Madison Ave.
New York, NY 10022

Dear Jim:

I am proud to present you with the Republican Senatorial Medal of Freedom -- the highest and most prestigious honor the Republican members of the United States Senate can bestow on an individual.

The Republican Senatorial Medal of Freedom signifies that you stand apart from other Americans, and it is presented in recognition of your commitment to our Party and our nation. I should also note that this is the first presentation of the Republican Senatorial Medal of Freedom in nearly three years.

I truly wish I had the opportunity to present your Medal in person, because it would offer me the chance to convey my thanks, and those of all my Republican Senate colleagues, for your continued commitment to the values, principles and ideals we all share.

Through your support of the Republican Senatorial Inner Circle, you have stood by us in our legislative and political battles. When we faced our greatest challenges, you stepped forward to serve. And today, your help continues to play a critical role in our battle to return a Republican Majority to the U.S. Senate.

Few Americans take on such responsibility or play such a personally active role in America's government. Indeed, that is why you are one of only a few individuals in New York to be recognized as a Republican Senatorial Medal of Freedom recipient.

It is a great honor for me to present you with this specially commissioned 2002 Medal of Freedom. In recognition of this historic time in our nation's history, I had the ribbon on your Medal changed from its traditional royal blue to red, white and blue and I am pleased that the enclosed Medal bears the symbolic colors of our nation's flag. Even if you are a past Medal of Freedom recipient, I think it's important for you to have this special edition Medal.

*The Chairman and Executive Committee*

*hereby appoint*

# James Couri

*of*

# New York

*to the*

# *Presidential Business Commission*

*in recognition of extraordinary leadership and input in moving*

*the President's initiative forward and promoting a pro*

*business agenda in Washington.*



National Republican
Congressional Committee.

Majority Whip